**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| MATTHEW S. BECKER | : | CIVIL ACTION |
| | : | |
| v. | : | NO. 19-1032 |
| | : | |
| JOHN E. WETZEL | : | |

## MEMORANDUM

KEARNEY, J.                                                                                          August 12, 2020

      Matthew S. Becker is currently serving a life sentence without possibility of parole after a Lancaster County jury found him guilty of murdering his pregnant girlfriend Allison Walsh and their unborn baby in August 2011. The trial court admitted evidence of statements made during an August 18, 2011 interview with state police after finding the interview was non-custodial and, even if it was custodial, Mr. Becker did not unambiguously invoke his right to silence. The trial court also permitted Rule 404(b) evidence relating to Mr. Becker's prior bad acts and character. The Pennsylvania Superior and Supreme Courts affirmed the conviction and sentence. The Pennsylvania courts denied Mr. Becker's post-conviction challenges to his trial counsel.

      Mr. Becker now asks us to take a fresh look and issue a writ of habeas corpus finding the trial court erred in admitting trial evidence and denying his post-conviction challenges to his counsel's assistance. But we may not vacate final state court convictions just because the petitioner vigorously disputed the facts in the trial court pretrial hearings. Congress requires we defer to the state court final judgments unless the state court's order is contrary to, or involved an unreasonable application of, clearly established federal law as determined by the United States Supreme Court or based on an unreasonable determination of the facts in light of the evidence presented to the state court. Mr. Becker does not meet this standard. We deny his petition for habeas relief and find no grounds for an evidentiary hearing or certificate of appealability.

## I.     Relevant facts adduced from the state court record.

Matthew S. Becker admits shooting his pregnant girlfriend Allison Walsh on August 12, 2011 in his bedroom in his parents' home when the parents were not home. She and the fetus died from the gunshot.  Following a 911 call from Mr. Becker's father, emergency personnel from the local fire department arrived at the Becker home around 11:00 p.m. Emergency personnel found Ms. Walsh dead with a gunshot wound to the head. After confirming Ms. Walsh died, Mr. Becker became verbally aggressive to the first responders and then physically aggressive by punching out a window of a cabinet and running up and down the stairs of the house. Mr. Becker told first responders he shot Ms. Walsh and it was his fault, "I screwed up," and "I shot my f****** girlfriend."

Paramedics arrived after the local fire department, and transported Ms. Walsh to the hospital to attempt to save the unborn baby.  A state police forensic team arrived at the Becker home around 11:35 p.m. and began processing the scene.  Mr. Becker and his father went to the hospital where state troopers later detained Mr. Becker and took him to the Harrisburg State Police barracks.

### *Troopers' August 13, 2011 interview of Mr. Becker.*

Upon arrival at the Harrisburg barracks in the early morning hours of August 13, 2011, Corporal Robert Courtright and Trooper Chadwick Roberts interviewed Mr. Becker.  Mr. Becker agreed to the recording of the interview, waived his *Miranda*[1] rights after they were read to him, and told the troopers he had "nothing to hide." Mr. Becker acknowledged he understood his *Miranda* rights and agreed to proceed with the interview.[2] Mr. Becker does not contest a violation of his rights during the August 13, 2011 interview.

Mr. Becker told the troopers only he and Ms. Walsh were home at the time of the shooting, and his parents and sister were out on a trip.[3] Mr. Becker told troopers after he and Ms. Walsh bought a new .22 caliber semi-automatic pistol earlier in the evening, he wanted to clean the gun and "play around" with it when the gun fired.[4] He first said he made sure nothing was in the chamber of the gun and "then boom."[5] He denied having a magazine in the gun, but then admitted he loaded the magazine with eleven rounds, but then took out the magazine.[6] After Ms. Walsh went to bed to read a book, Mr. Becker told troopers he wanted to "devil her" because she wanted to read a book and relax and he did not want to let her enjoy her book and instead wanted her to talk to him.[7] Mr. Becker told troopers he put the loaded magazine in the gun and began cycling rounds out of the gun by pulling the slide back, dropped the magazine out of the gun, and while walking toward Mr. Walsh to show her the gun, it went off.[8]

Mr. Becker told troopers he tried CPR.[9] A first responder at trial testified he did not observe any signs of CPR.[10] Mr. Becker conceded he did not call 911 because he couldn't find his phone, and conceded his father called 911.[11] There is a discrepancy in the timing of when the Becker family returned to the home and the time of the shooting; Mr. Becker told troopers his parents arrived home no more than two minutes after the shooting while Mr. Becker's mother told emergency responders they arrived home twenty minutes after the shooting.[12]

Mr. Becker admitted to shooting Ms. Walsh but explained he did so accidentally. He admitted to buying a .22 caliber pistol earlier in the day, and explained he wanted to clean the gun when it accidentally discharged. Mr. Becker explained while checking to make sure a round was not in the chamber of the gun, it accidentally fired.[13] Mr. Becker stated the gun did not have a magazine in it when it fired and confirmed he removed a loaded magazine from the gun. Mr.

Becker stated: "I never even had the gun pointed at her. I don't, I don't play around. I know my firearms. I know what I'm doin'."[14]

Mr. Becker told the troopers Ms. Walsh rested in bed reading while he worked with the gun.  He told Corporal Courtright: "I then asked her to look up about magazines for that gun and, you know, go on the internet and see if they were cheaper anywhere. And then she was doing that and then looked at me and told me to do it myself. Went over there and was layin' down and I was sittin' there. So told me to do that, so I told her I was going to turn Netflix on, watch something, do the computer shit. And, that that stupid 'system update' shit came on. And that, I said 'Well, I'm gonna devil her.' I walked over there, took it out of the case, you know. I already had the magazine out before and was loading, so you know, I mean, we're going into it."[15]

When asked by Corporal Courtright what he meant by "devil her," Mr. Becker responded: "because she wanted to lay down and read a book … [S]he's laying in bed, you know, and she's trying to read a book and relax and she's pregnant and I just wanted to go over and talk to her and not let her enjoy her book and have to sit there and have her talk to me."[16]

Mr. Becker described how he loaded the magazine: he loaded eleven rounds of ammunition into the magazine and began "cycling rounds" out of the gun by pulling the slide back and ejecting unspent rounds. Mr. Becker explained the gun "[is] just kicking out the shells."[17]  Mr. Becker estimated he cycled six to eight rounds out of the gun and, although unsure, told Corporal Courtright the rounds were likely lying "all over the place" in the couple's bedroom.  Mr. Becker admitted to pulling the trigger but stated, "I was trying to let the hammer back down" and held the gun in one hand and did not think about where the gun may have been pointed.[18] Mr. Becker repeatedly stated that he performed CPR on Ms. Walsh.  He denied fighting with Ms. Walsh or an intention to shoot her.[19]

At some point in the interview, Mr. Becker expressed an intent to kill himself. This prompted Trooper Roberts to request an involuntary commitment of Mr. Becker to a mental health facility. Trooper Roberts transported Mr. Becker to Hershey Medical Center for involuntary commitment under Pennsylvania law.[20]

Trooper Roberts and Corporal Courtright returned to the Becker home in the early morning hours after the shooting where troopers were processing the scene.[21]  Trooper Roberts, along with other troopers, searched the Becker home and collected evidence. Trooper Roberts looked for seven or eight unspent rounds ejected from the gun somewhere in the bedroom as explained by Mr. Becker but found none. Trooper Roberts recovered a box of ammunition missing eleven rounds.[22]  During the search of the bedroom, troopers found: one spent .22 shell casing found on the floor next to the bed where Ms. Walsh rested (later tested and confirmed as the cartridge fired from the gun used to shoot her);[23] a magazine containing eight unspent rounds; one unspent single round on an armrest of a sofa; and, as found by emergency responders arriving on scene, one unspent round cleared from the gun by first responder Fire Chief Montgomery.

Trooper Roberts and Corporal Courtright continued the investigation into the shooting including interviewing: emergency personnel who responded to the call; Mr. Becker's parents and sister; Megan Walsh, sister of Allison Walsh;[24] Danielle Detwiler, a former girlfriend of Mr. Becker, on August 15, 2011;[25] and the gun shop owner who sold Mr. Becker the gun used to shoot Ms. Walsh.[26]  From his interview with gun shop staff, Trooper Roberts learned the gun purchased by Mr. Becker has two safety features: the gun cannot be fired without a magazine and a safety grip requires a thumb on the grip to fire.

***Mr. Becker appears at the state police barracks on August 18, 2011.***

Days into the investigation, Trooper Roberts learned Mr. Becker voluntarily committed himself and then voluntarily checked himself out of the psychiatric facility.[27]  On the afternoon of August 17, 2011, Trooper Roberts and Corporal Courtright went to the Becker home intending to speak with Mr. Becker but did not find him there.[28] Trooper Roberts testified, "we began to investigate or find out where he was.  And another trooper had located the family and asked if he [Mr. Becker] would come in to speak with us."[29]  Trooper Roberts testified a Trooper McCurdy called "and spoke to Matthew Becker and asked if he would be willing to come into the Lancaster – Ephrata State Police Barracks, which [he] did, on his own, with his own vehicle, or with his father in their own vehicle."[30]

***Mr. Becker agrees to visit the State Police for a follow-up interview.***

On August 18, 2011, Mr. Becker and his father drove to the Ephrata State Police barracks to speak with Trooper Roberts and Corporal Courtright.[31]  Mr. Becker's parents retained attorney Robert Bacher for their son. Attorney Bacher went to the Ephrata barracks on August 18, 2011, but police did not allow Attorney Bacher to see Mr. Becker. Mr. Becker did not know his parents retained Attorney Bacher or of Attorney Bacher's presence at the Ephrata barracks on August 18, 2011.

At both the pre-trial suppression hearing[32] and trial, Trooper Roberts and Corporal Courtright testified to the circumstances surrounding the August 18, 2011 interview. Corporal Courtright testified: when Mr. Becker came to the Ephrata barracks, the troopers did not put him under investigatory detention, arrest, or charge him with any offense; the troopers read aloud Mr. Becker's *Miranda* rights; Mr. Becker verbally indicated he understood his rights; signed a waiver of his *Miranda* rights; did not ask questions about his rights or request an explanation or

6

clarification of his rights; exhibited an understanding of his rights; did not appear to be under the influence of any controlled substance; and Mr. Becker's agreement to provide his statements to the troopers appeared to be a free and voluntary act.[33]

Trooper Roberts testified at the pre-trial suppression hearing: Mr. Becker came to the Ephrata barracks voluntarily; Mr. Becker did not object to recording the interview; troopers did not place Mr. Becker in handcuffs or place him under arrest and was free to leave the barracks if he wished; the door to the interview room has a window; one of the walls of the room has a two-way window; the door to the interview room remained closed but not locked; both Trooper Roberts and Corporal Courtright wore a suit and tie and had their service sidearms but neither brandished their weapons during the interview; Trooper Roberts read the *Miranda* rights aloud to Mr. Becker; Mr. Becker signed a waiver of his *Miranda* rights; Mr. Becker verbally indicated he understood his rights; Mr. Becker did not ask questions or request explanation or clarification about his rights; Mr. Becker appeared able to understand Trooper Roberts when he reviewed Mr. Becker's *Miranda* rights; Mr. Becker did not appear to be under the influence of alcohol or a controlled substance; and Mr. Becker's agreement to provide his statements to the troopers appeared to be a free and voluntary act.[34]   Neither Trooper Roberts nor Corporal Courtright made an express or implied promise or consideration in exchange for Mr. Becker's statement; did not force, coerce, or induce Mr. Becker to make his statement; and did not threaten him with either immediate or future consequences for failing to provide a statement.[35]

Mr. Becker has a different view of the August 18, 2011 interview.  He argues "two armed police officers" (presumably Trooper Roberts and Corporal Courtright) escorted him to the windowless interview room where they "held [him] incommunicado."[36]  Although over the age of eighteen, Mr. Becker objects the troopers did not permit his father to attend the interview.  Mr.

Becker concedes the troopers read to him his *Miranda* rights, but argues the troopers never told him "he was the sole target of the investigation and that his purported inconsistent stories was inferred as a consciousness of his guilt."[37]

### Troopers' August 18, 2011 interview of Mr. Becker.

The troopers videotaped the August 18 interview, which provides us with a minute-by-minute review of the context of the statements challenged today. The interview began at approximately 10:30 a.m. when Trooper Roberts and Corporal Courtright offered Mr. Becker a drink and told him if he wanted water or soda, to let them know; read Mr. Becker his *Miranda* rights; reviewed his *Miranda* rights with him; and told him the purpose of the second interview was in continuance of the investigation.[38]   Corporal Courtright told Mr. Becker no one would threaten him.[39]   Mr. Becker did not object to the interview being recorded and signed a waiver of his *Miranda* rights.[40]

The troopers reviewed with Mr. Becker the statements he made at the August 13, 2011 interview. The troopers asked Mr. Becker questions about the gun used in the shooting of Ms. Walsh, and, specifically, asked him to explain the circumstances of the shooting considering information troopers already gathered from other people in their investigation. Trooper Roberts and Corporal Courtright asked Mr. Becker about the gun's safety features. Corporal Courtright told Mr. Becker the gun's safety feature will not allow it to fire without a magazine in it; when a first responder cleared the gun the night of the shooting, it had another round in the chamber, meaning Mr. Becker fired a loaded weapon with a magazine in it and the only way to fire the gun was to pull the trigger; and confronted Mr. Becker about inconsistencies in his August 13, 2011 interview.[41]   Corporal Courtright explained another gun safety feature, a grip safety, will not allow the gun to fire if the thumb is not on the grip, contrary to Mr. Becker's explanation he had

his thumb on the hammer when the gun went off.[42]  Corporal Courtright confronted Mr. Becker about his August 13 statement he used his thumb on the hammer and finger on the trigger to "let it down easily and [the gun] went off"; Mr. Becker denied making this statement five days earlier.[43]

At around 11:28:40 a.m., or approximately one hour into the interview, Mr. Becker responded to questions regarding his handling of the gun versus the safety features by saying: "I don't know.  I have nothing more to say 'cause no matter what I say, youse trying to make me something I'm not."[44] Corporal Courtright and Trooper Roberts, told Mr. Becker to relax, offered him a drink, and then left the interview room.

After about an eight to nine minute break in questioning, Trooper Roberts continued to question Mr. Becker regarding his home phone, cell phone, location of his cell phone, calling 911 the night of the shooting, his statement he held Ms. Walsh after the shooting, his mother's direction for him to perform CPR, his participation in a sportsman's club, and his proficiency with firearms.[45]  Trooper Roberts offered Mr. Becker water and took another approximately nine minute break. Trooper Roberts and Corporal Courtright returned to the room and began measuring Mr. Becker's height and questioning him about his relationship with Danielle Detwiler including her descriptions of him as controlling and abusive; his history of pointing guns at people; his history of calling Ms. Walsh fat and ugly; and, Corporal Courtright's observation when Mr. Becker "gets angry, [he] gets cruel," the paternity of Ms. Walsh's baby, and Ms. Walsh's expressed intent to move back to her father's home.[46]

At 12:31:40 p.m., Mr. Becker stated "OK. I'm done now."

Corporal Courtright and Trooper Roberts left the interview room.  But then approximately thirty minutes later, Trooper Roberts again began questioning Mr. Becker by

asking, "What do you think should happen to you?" and commenting, "You have to answer to this" because the "family wants justice."[47]  Trooper Roberts questioned Mr. Becker regarding the consequences of the shooting, how close he stood to Ms. Walsh when he fired the gun.[48] Trooper Roberts offered Mr. Becker a drink and bathroom break and gave Mr. Becker a cigarette.

Questioning resumed regarding why Mr. Becker did not immediately call 911, and Mr. Becker again explained an accidental shooting.[49] Corporal Courtright challenged Mr. Becker about his explanation of an accidental shooting and accused Mr. Becker of being untruthful, conflicting information about attempting CPR, his conduct after the shooting, and before the shooting.[50]  Mr. Becker conceded he put a magazine in the gun, contradicting his earlier statements, acknowledged his ability to clear a weapon, and said "I took the magazine out, and I, honestly, I didn't clear it. I don't know why. I don't know why I didn't look. I don't. It's just dumb f*** luck."[51]

At the end of the August 18, 2011 interview, Trooper Roberts and Corporal Courtright informed Mr. Becker charges would be filed against him and placed him under arrest. The court held a preliminary hearing on October 11, 2011. On November 28, 2011, the Commonwealth filed an information charging Mr. Becker with criminal homicide, 18 Pa. Cons. Stat. Ann. § 2501, and criminal homicide of an unborn child, 18 Pa. Cons. Stat. Ann. § 2603.

***Pre-trial suppression hearing.***

Mr. Becker's counsel moved for omnibus pre-trial relief on May 30, 2012, seeking, among other things, to suppress his statements from the August 18, 2011 interview and to exclude evidence of "prior bad acts" through testimony from witnesses, including his former girlfriend, Danielle Detwiler, her sister, Devon Detwiler, and Megan Walsh, the sister of Allison

Walsh.  The Commonwealth intended to introduce evidence of Mr. Becker's prior bad acts under Pennsylvania Rule of Evidence 404(b)(2).[52]  Rule 404(b)(2) allows the admission of "crimes, wrongs or other acts" for "another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.  In a criminal case this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice."

Mr. Becker argued Trooper Roberts and Corporal Courtright obtained the statements made at the August 18, 2011 interview in violation of *Miranda*, the Fourth, Fifth, Sixth, and Fourteenth Amendments of the United States Constitution and the Pennsylvania Constitution because he believed he was in custody at the time of the interview and he did not knowingly, intelligently, voluntarily, or explicitly waive his *Miranda* rights. Mr. Becker argued the court should preclude Danielle and Devon Detwiler's testimony regarding his prior bad acts during Danielle Detwiler's two-year relationship with him and preclude Megan Walsh's testimony regarding Allison Walsh's fear of Mr. Becker.

The trial court held a suppression hearing on August 15, 2012, and, after considering the evidence including the recordings of both interviews and the parties' briefing, the trial court issued an order on January 10, 2013 supported by specific findings: the August 18, 2011 interview was non-custodial and did not trigger *Miranda's* protections;[53] identified the "most important fact" as Mr. Becker's voluntary appearance at the Ephrata barracks to speak to troopers where he never asked to leave, or attempted to leave, the interview;[54] even if state police held Mr. Becker in custody during the August 18, 2011 interview, the troopers gave him his *Miranda* warnings; and Mr. Becker did not invoke his *Miranda* rights through the two statements made about an hour apart: "I don't know.  I have nothing more to say 'cause no matter what I say

youse trying to make me seem like something I'm not"; and, "OK. I'm done now." The trial court found both statements ambiguous and Mr. Becker did not unambiguously invoke his right to remain silent, and the Constitution did not require the troopers to end the interrogation or ask if Mr. Becker wanted to invoke his *Miranda* rights.[55]

The trial court also allowed portions of the proffered testimony of Danielle and Devon Detwiler and Megan Walsh but prohibited other areas of proffered testimony.[56] Based on the trial court's rulings on the suppression motion, Danielle Detwiler testified at trial to instances when Mr. Becker pointed a handgun at her multiple times; while the initial instances were done jokingly, "other times [Mr. Becker] would get erratic and angry"; and Mr. Becker shot her more than ten times on various parts of her body with an air-soft/BB gun when he became angry.[57]

Devon Detwiler testified she saw Mr. Becker with airsoft/BB guns and saw him shoot her sister with an air-soft/BB gun on multiple occasions when he became angry.[58]

Megan Walsh testified at trial including to an exchange she had with her sister Allison Walsh over Facebook instant messaging on July 21, 2011, three weeks before her death. The trial court permitted Megan Walsh to testify to the relevant portion of the Facebook conversation:

> Allison Walsh:  i am SO (sic) tempted to just pack all my s*** up but I'm deathly afraid of his reaction.
>
> Megan Walsh: what would he do?
>
> Allison Walsh: probably flip out and pull a gun on me knowing him
>
> Megan Walsh: wtf.
>
> Megan Walsh: what a psycho.[59]

On the first day of jury selection, Gregory Miller, a friend of Mr. Becker, contacted the Commonwealth with information.  State Police interviewed Mr. Miller two days later and, based on Mr. Miller's statement, the Commonwealth filed a second supplemental notice to introduce

his testimony under Pennsylvania Rule of Evidence 404(b)(2).[60]  Mr. Miller testified he observed

Mr. Becker verbally abusing Ms. Walsh and threatening to pistol-whip her.[61]

### The jury convicts, the trial judge sentences Mr. Becker to life in prison, and later denies Mr. Becker's post-trial motions.

After an eight-day jury trial in March 2013, a jury found Mr. Becker guilty of criminal

homicide, murder in the first degree for the death of Ms. Walsh and guilty of criminal homicide,

murder in the third degree for the death of the baby.  Mr. Becker did not testify at trial. After the

jury deadlocked on the death penalty sentence, the trial judge sentenced Mr. Becker to life

imprisonment on the first-degree murder charge and a term of twenty to forty years for the third

degree murder charge to run consecutively to the life sentence.

Mr. Becker moved for post-sentence relief arguing trial errors and moved for acquittal or,

alternatively, to vacate the sentence and request a new trial.[62] Mr. Becker argued, among other

things, the trial court erred in admitting the testimony of Danielle and Devon Detwiler, Megan

Walsh, and Gregory Miller as unduly prejudicial with no probative value, and the court erred by

admitting Mr. Becker's statements following his alleged invocation of his *Miranda* right to

remain silent at two points in the August 18, 2011 interview.

The trial court denied Mr. Becker's post-sentence motions. Mr. Becker then appealed to

the Pennsylvania Superior Court.

### The Pennsylvania Superior Court affirms the trial court on Mr. Becker's direct appeal.

Mr. Becker raised twenty-five issues in his direct appeal.[63]  Two issues are relevant to

Mr. Becker's habeas petition: (1) the trial court erred, in violation of Pennsylvania Rule of

Evidence 404(b), in admitting the testimony of Danielle and Devon Detwiler, Megan Walsh, and

Gregory Miller; and (2) the trial court erred in admitting the statements made by Mr. Becker at

the August 18, 2011 interview under the United States and Pennsylvania Constitutions.

After Mr. Becker's notice of appeal, the trial court issued an opinion under Pennsylvania Rule of Appellate Procedure 1925(a).[64]  The trial court found it properly admitted Danielle and Devon Detwiler's testimony regarding Mr. Becker's earlier threats involving guns and firearms. The trial court found although the Detwilers' experiences with Mr. Becker occurred three years before Ms. Walsh's shooting made "the time between the incidents … not highly probative as to [Mr.] Becker's intent," there is a "strong similarity in the circumstances surrounding these prior incidents and the crime for which [Mr.] Becker was on trial."[65] The trial court also found evidence of prior violent acts admissible to rebut Mr. Becker's defense of accident, mistake or lack of required intent, and the Detwilers' testimony "made it more probable that [Mr.] Becker shot [Ms.] Walsh intentionally, and less probable that the shooting was accidental," satisfying the requirement evidence be introduced for some legitimate purpose and not merely to prejudice Mr. Becker by showing him to be a person of bad character.[66]  The trial court concluded it properly admitted the Detwilers' testimony.

The trial court found Megan Walsh's testimony regarding her Facebook conversation with her sister Allison properly admitted for state of mind evidence relevant to Mr. Becker's theory of an accidental shooting and Ms. Walsh's expression of her desire to leave Mr. Becker but feared he would pull a gun on her.[67]

The trial court found it properly admitted Gregory Miller's testimony regarding Mr. Becker's threats of violence, including a threat to pistol whip Ms. Walsh, and his verbal abuse towards her. The court found Mr. Miller's testimony relevant for the Commonwealth to rebut Mr. Becker's characterization of his relationship with Ms. Walsh and probative of showing lack of accident.[68]

14

On the admission of Mr. Becker's statements at the August 18, 2011 interview, the trial court found, as it did on the suppression motion, the state did not have Mr. Becker in custody because of two "key facts": Mr. Becker voluntarily came to the Ephrata barracks on August 18 and never asked to leave or attempted to leave the interview.[69] Even if in custody, the trial court found Mr. Becker received and understood the *Miranda* warnings and did not unambiguously invoke his right to remain silent.[70]

The Pennsylvania Superior Court affirmed the trial court.[71] The Superior Court adopted the trial court's reasoning in its memoranda from the suppression motion and Rule 1925(a) without discussion, rejecting Mr. Becker's argument the court erred in admitting Mr. Becker's statements after his two alleged invocations of the right to silence during the August 18, 2011 interview.

The Superior Court analyzed Mr. Becker's objection to the admission under Rule 404(b)(2) of the Detwilers' testimony, Megan Walsh's testimony, and Mr. Miller's testimony. The Superior Court concluded the trial court properly admitted the objected-to testimony and rejected Mr. Becker's challenge to the admission of evidence under Rule 404(b) and affirmed the trial court.  However, the Superior Court found Megan Walsh's testimony regarding her Facebook conversation with Allison Walsh should not have been admitted but found it harmless error.  The Superior Court concluded evidence of a cartridge recovered in the chamber of the gun showed the magazine must have been in the gun for the next cartridge to have been chambered after Ms. Walsh's shooting. In his first interview with state police on August 13, Mr. Becker characterized the shooting as accidental based on his claim he had no magazine in the gun and he believed the gun to be empty. When recovered on the night of the shooting, the gun had one cartridge after firing disproving Mr. Becker's explanation the magazine had not been in the gun

at the time it fired. The Superior Court found "[i]n light of this critical evidence, which fully supports the Commonwealth's theory that [Mr. Becker] knowingly pointed a loaded gun at [Ms.] Walsh, we conclude the admission of Megan Walsh's testimony of her sister's Facebook statements was harmless error."[72]

Mr. Becker petitioned for allowance of appeal to the Pennsylvania Supreme Court.[73]  The Prothonotary of the Pennsylvania Supreme Court rejected Mr. Becker's petition as untimely. The Prothonotary advised Mr. Becker he may file a petition for leave to file a petition for allowance of appeal *nunc pro tunc*.  Mr. Becker elected not to do so.  Mr. Becker's judgment of sentence became final on April 20, 2015, thirty days after the Superior Court's decision.

### *Mr. Becker petitions for post-conviction relief citing his counsel's ineffective assistance.*

Mr. Becker filed a Post-Conviction Relief Act ("PCRA") petition almost a year later on April 5, 2016.[74] Mr. Becker claimed ineffective assistance of his counsel violating his Sixth and Fourteenth Amendment rights based on seven arguments: (1) failing to move to suppress Mr. Becker's statements made at the August 18, 2011 interview based on an ineffective *Miranda* waiver where troopers denied him access to Attorney Bacher; (2) failing to call Attorney Bacher at the suppression hearing and trial and failing to call Mr. Becker at the suppression hearing; (3) failing to object to Corporal Courtright's trial testimony giving "improper legal opinion" Mr. Becker's confession was voluntary; (4) failing to request a *corpus delecti* instruction at trial; (5) failing to object to and request a cautionary instruction to the Commonwealth's forensic pathologist expert's testimony "once a trigger is pulled, that's an intentional act"; (6) failing to call Mr. Becker at trial and/or his decision not to testify does not constitute a knowing, voluntary, and intelligent waiver; and (7) failing to request a cautionary instruction explaining the limited

use of Rule 404(b) evidence regarding the testimony of the Detwiler sisters, Megan Walsh, and Gregory Miller.

On September 14, 2015, the state trial court heard Mr. Becker's post-conviction petition. Mr. Becker's trial counsel, Dennis Charles and Gavin Holihan, testified. After hearing and considering the parties' briefs, the post-conviction court denied Mr. Becker's petition.[75] With respect to the Rule 404(b) cautionary instruction, the court found trial counsel provided no explanation for failing to request such an instruction and, although trial counsel thought the trial court agreed to give a cautionary instruction after the charging conference, the jury did not receive this instruction.[76] The court recognized evidence of prior bad acts must be accompanied by a cautionary instruction, but the failure is harmless error where, as here, "the uncontradicted and properly admitted evidence of guilt is 'so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.'"[77]

Reviewing the trial evidence, the post-conviction court noted evidence of a live round in the chamber of the gun used to shoot Ms. Walsh after it fired, contradicting Mr. Becker's statement he had no magazine in the gun at the time it fired, supported the Commonwealth's theory Mr. Becker pointed a loaded gun at Ms. Walsh. The court found harmless error, noting the Pennsylvania Superior Court's decision in the direct appeal similarly finding harmless error. On May 25, 2017, Mr. Becker appealed the denial of his Post-Conviction Relief Act petition to the Pennsylvania Superior Court.

***The Pennsylvania Superior Court affirms the denial of Mr. Becker's post-conviction petition.***

Mr. Becker raised six of the seven ineffectiveness grounds before the Pennsylvania Superior Court.[78] The court's Rule 1925(a) opinion incorporated its April 11, 2017 opinion.[79]

Mr. Becker briefed only five issues: whether his trial counsel was ineffective for failing to (1) move to suppress Mr. Becker's statements made at the August 18, 2011 interview based on an ineffective *Miranda* waiver where troopers denied him access to Attorney Bacher; (2) call Attorney Bacher at the suppression hearing and trial; (3) object to Corporal Courtright's trial testimony giving "improper legal opinion" on the voluntariness of Mr. Becker's confession; (4) request a *corpus delicti* instruction at trial; and (5) request a cautionary instruction explaining the limited use of Rule 404(b) evidence regarding the testimony of the Detwiler sisters, Megan Walsh, and Gregory Miller.[80]

On June 26, 2018, the Pennsylvania Superior Court affirmed the denial of post-conviction relief in a thirty-seven-page opinion.[81] The Superior Court agreed with the court's finding: the conduct of the state troopers who prevented Attorney Bacher from contacting Mr. Becker during the interview did not violate his otherwise knowing, intelligent, and voluntary waiver of his *Miranda* rights; trial counsel articulated a reasonable basis for deciding not to object to Corporal Courtright's opinion on the voluntariness of Mr. Becker's opinion; and trial counsel's failure to request a *corpus delicti* instruction is without merit.

On the issue of Rule 404(b) evidence through the testimony of the Detwilers, Megan Walsh, and Gregory Miller, the Pennsylvania Superior Court agreed with the trial court (and on the Commonwealth's concession) the failure to request a cautionary instruction "has arguable merit and that trial counsel failed to articulate a reasonable strategic basis for failing to request a cautionary instruction."[82] The Superior Court then analyzed whether Mr. Becker established prejudice.  Reviewing relevant Pennsylvania authority, the Superior Court concluded Mr. Becker failed to establish unfair prejudice and failed to establish error in the post-conviction court's ruling.

Mr. Becker petitioned for allowance of appeal to the Pennsylvania Supreme Court raising two issues: (1) whether the Superior Court erred in denying the ineffective assistance of trial counsel claim for failure to file a motion to suppress the August 18, 2011 statement based on an invalid *Miranda* waiver where state police prevented Attorney Bacher from seeing Mr. Becker; and (2) whether the Superior Court erred in finding no prejudice from trial counsel's failure to request a cautionary instruction for the Rule 404(b) evidence.[83] On January 7, 2019, the Pennsylvania Supreme Court denied the petition for allowance of appeal.[84]

## II.    Analysis

Mr. Becker now petitions for habeas relief making six arguments:

1. State police failed to "scrupulously honor" his right to remain silent by continuing to question him after he invoked his Fifth Amendment right and by denying him access to Attorney Bacher;

2. Admission of prior bad acts testimony under Rule 404(b) violated his right to a fair trial under the Sixth and Fourteenth Amendments;

3. Ineffective assistance of trial counsel for failure to file a motion to suppress his statements at the August 18, 2011 interview based on an invalid *Miranda* waiver in denying him access to Attorney Bacher;

4. Ineffective assistance of trial counsel for failing to object to testimony of Corporal Courtright's improper legal opinion of a voluntary confession;

5. Ineffective assistance of trial counsel for failing to request a *corpus delicti* instruction; and

6. Ineffective assistance of trial counsel for failing to request a cautionary instruction explaining the limited use of Rule 404(b) prior bad acts evidence.

The Commonwealth concedes Mr. Becker's petition is timely and all claims are exhausted except the second claim. It asserts Mr. Becker's constitutional argument regarding the Rule 404(b) evidence is not exhausted and procedurally defaulted because he did not make this argument in state court; he argued only the Rule 404(b) evidence violated state rules of evidence,

not a constitutional violation.[85] Even if not procedurally defaulted, the Commonwealth argues the second claim, as well as the other claims, fail on the merits.

Mr. Becker filed a traverse in support of his habeas petition, arguing we must vacate his conviction and sentence and grant him a new trial.[86] Mr. Becker alternatively asks we hold an evidentiary hearing on his motion.[87]

Congress, through the Antiterrorism and Effective Death Penalty Act ("AEDPA"), directs we "shall not" grant habeas relief "with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[88] As the Supreme Court instructs, this is a "highly deferential standard for evaluating state-court rulings" and "demands that state-court decisions be given the benefit of the doubt."[89]

Under section 2254(d)(1), the Supreme Court further instructs "an *unreasonable* application of federal law is different from an *incorrect* application of federal law."[90] We are directed when making the "unreasonable application" inquiry, we "should ask whether the state court's application of clearly established federal law was objectively unreasonable."[91] We "may not issue the writ [of habeas corpus] simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."[92] We apply an objective standard; "[t]his distinction creates 'a substantially higher threshold' for obtaining relief than de novo review."[93]

Because state courts have "the duty and ability … to adjudicate claims of constitutional wrong, AEDPA erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court. AEDPA requires 'a state prisoner [to] show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error ... beyond any possibility for fairminded disagreement.' … 'If this standard is difficult to meet'—and it is—'that is because it was meant to be.' We will not lightly conclude that a State's criminal justice system has experienced the 'extreme malfunctio[n]' for which federal habeas relief is the remedy."[94]

"The test for § 2254(d)(2)'s 'unreasonable determination of facts' clause is whether the petitioner has demonstrated by 'clear and convincing evidence,' § 2254(e)(1), that the state court's determination of the facts was unreasonable in light of the record."[95] Section 2254(e)(1) provides "a determination of a factual issue made by a State court shall be presumed to be correct" and the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."[96]

Where a habeas petitioner claims ineffective assistance of counsel, "review is 'doubly deferential,' because counsel is 'strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'"[97] We are directed to "afford 'both the state court and the defense attorney the benefit of the doubt.'"[98]

In addressing a section 2254 petition, we are directed to "look to the highest state court to issue a reasoned opinion and examine its reasoning."[99] The trial court's opinion rejecting Mr. Becker's *Miranda* argument the court erred admitting his statements from the August 18, 2011 interview, adopted without discussion by the Pennsylvania Superior Court, is the last reasoned decision, and we examine it under section 2254(d)'s standards.[100] The Pennsylvania Superior

Court is the highest state court to issue opinions on Mr. Becker's direct appeal as to the Rule 404(b) evidence[101] and post-conviction appeal based on ineffective assistance.[102]

### A.      Mr. Becker fails to show a basis under *Miranda* for habeas relief.

Mr. Becker first asserts state police failed to "scrupulously honor" his right to remain silent during the August 18, 2011 interview after he twice invoked his right to remain silent. The first statement, made approximately one hour into questioning, is:

- "I don't know. I have nothing more to say 'cause no matter what I say youse trying to make me seem like something I'm not."[103]

The second statement made approximately one hour after the first statement is:

- "OK. I'm done now."[104]

The trial court found, both in its opinion denying Mr. Becker's pre-trial suppression motion and its 1925(a) opinion, the August 18, 2011 interview was non-custodial based on "two key facts": "First and most important, is that [Mr.] Becker voluntarily came into the police station. Second, [Mr.] Becker never asked to leave or attempted to leave."[105]

The trial court next determined Mr. Becker did not unambiguously invoke his right to remain silent under the Supreme Court's decision in *Berghuis v. Thompkins*.[106]  In *Berghuis*, the Court held a suspect must invoke his *Miranda* right to counsel and to remain silent "unambiguously"; '[i]f an accused makes a statement concerning the right to counsel 'that is ambiguous or equivocal' or makes no statement, the police are not required to end the interrogation, or ask questions to clarify whether the accused wants to invoke his … *Miranda* rights."[107]  The Court found "no principled reason to adopt different standards for determining when an accused has invoked the *Miranda* right to remain silent and the *Miranda* right to counsel"; both must be unambiguous.[108] The Court applied its rule in *Davis v. United States,* addressing the invocation of the right to counsel, to the right to remain silent: "Invocation of the

*Miranda* right to counsel 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.' But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, our precedents do not require the cessation of questioning."[109]

The state trial court applying *Berghuis* determined both statements lacked the specificity required to invoke the right to remain silent under *Miranda*.[110] The trial court found compelling the fact Mr. Becker "continued to engage troopers in conversation immediately following each alleged invocation," and, under *Berghuis*, the court can infer a waiver of *Miranda* rights based on his actions, continuing his conversation with the troopers.[111] The trial court found at no time in the interrogation did Mr. Becker unambiguously or unequivocally state he wished to invoke his right to remain silent or right to counsel and held Mr. Becker received and understood his *Miranda* warnings and did not invoke his *Miranda* rights.[112]  In Mr. Becker's direct appeal, the Pennsylvania Superior Court affirmed the trial court's Rule 1925(a) opinion by adopting the trial court's reasoning without further analysis.[113]

Mr. Becker today argues the August 18, 2011 interview is custodial and the two statements are unambiguous invocations of his right to remain silent and troopers violated his right to remain silent when they continued their questioning after both the first and second statements. Mr. Becker argues the trial court "erred in failing to recognize this overt constitutional violation" and "[a]n examination of the record reveals that the state court's conclusions throughout this case that there was no *Miranda* violation was an incorrect application of *Miranda* and its progeny and based on an unreasonable determination of the facts."[114]

The Commonwealth responds the August 18, 2011 interview is not custodial, and, even if Mr. Becker were subject to custodial interrogation, Mr. Becker's two statements are ambiguous and lack the specificity required to invoke his right to remain silent under *Miranda*.[115]

> **1.    The state court did not misapply established federal law in finding the August 18, 2011 interview non-custodial.**

The Fifth Amendment protects an individual's right against self-incrimination. The Supreme Court's decision in *Miranda* safeguards this right by prohibiting the prosecution from using statements, "whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.[116] "'[C]ustody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion."[117]

To determine whether a person is in "custody," we are directed by the Supreme Court to make "two discrete inquiries": first, we look at the circumstances surrounding the investigation, and second, we ask, given the circumstances, "would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave."[118] When determining "how a suspect would have 'gauge[d]' his 'freedom of movement,'" we "must examine 'all of the circumstances surrounding the interrogation.'"[119] "Relevant factors include the location of the questioning, … its duration, … statements made during the interview, … the presence or absence of physical restraints during the questioning, … and the release of the interviewee at the end of the questioning."[120]  This is an objective inquiry, depending on "the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned."[121]   "Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a

formal arrest or restraint on freedom of movement of the degree associated with a formal arrest."[122]

      The trial court determined troopers did not subject Mr. Becker to custodial interrogation on August 18, 2011 based on "two key facts": (1) "most important[ly], is that [Mr.] Becker voluntarily came into the police station"; and (2) "[Mr.] Becker never asked to leave or attempted to leave."[123] As explained, we ask two questions to determine custodial status: first, the circumstances surrounding the interrogation, and, second, given the circumstances, would a reasonable person have felt "not at liberty to terminate the interrogation and leave."[124] The first inquiry is "distinctly factual" to which we apply a "presumption of correctness" under section 2254(d).[125] The second question requires us to apply "the controlling legal standard to the historical facts" presenting a "'mixed question of law and fact' qualifying for independent review."[126]

      We turn to the question of whether the state court adjudication of the claim "involved an unreasonable application" of clearly established law when it concluded troopers did not hold Mr. Becker in custody during the August 18, 2011 interview.[127] The state court record shows: After learning Mr. Becker voluntarily checked himself in and checked himself out of a psychiatric facility when the involuntary commitment expired, Trooper Roberts and Corporal Courtright determined they wanted to speak with Mr. Becker again. On August 17, 2011, the troopers went to the Becker home to speak with Mr. Becker but did not find him there and left. Another trooper located the Becker family "and asked if he [Mr. Becker] would come in to speak with us."[128] Trooper Roberts testified Trooper McCurdy called "and spoke to Matthew Becker and asked if he would be willing to come into the Lancaster – Ephrata State Police Barracks, which [he] did, on his own, with his own vehicle, or with his father in their own vehicle."[129]

The next day, August 18, 2011, Mr. Becker's father drove him to the Ephrata barracks and, upon arrival, Mr. Becker went into an interview room.[130]   Trooper Roberts asked Mr. Becker if he had any objection to the interview being recorded, to which Mr. Becker responded he had none, and Trooper Roberts told Mr. Becker the reason for the second interview is because of "problems with his first statement to us and inconsistencies that we found from talking to him, from the crime scene, and then other witnesses or, you know, friends, et cetera, through the investigation."[131]   Troopers did not detain Mr. Becker, put him in handcuffs, or place him under arrest.[132]   Troopers closed, but did not lock, the door to the interview room.[133] Trooper Roberts and Corporal Courtright wore suits and their sidearms, but neither brandished their weapons.[134] During the interview troopers offered Mr. Becker drink, cigarettes, and breaks.

Mr. Becker argues the Commonwealth's "fanciful" position the August 18, 2011 interview is not custodial "cannot be taken seriously."[135] But we are not reviewing the Commonwealth's arguments nor may we second guess the facts because we may view the adduced evidence differently without the benefit of evaluating witness credibility; our review under section 2254(d) is whether the state court's adjudication resulted in a decision contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or resulted in a decision based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  Mr. Becker does not meet this burden.

Mr. Becker argues the totality of the circumstances shows a custodial interrogation on August 18, 2011. He points to these facts: after release from "police-initiated psychiatric commitment," troopers requested he come back to the police barracks for further interrogation; once at the barracks, he "was taken to a remote and secure" part of the barracks "into a

windowless room and held incommunicado"; troopers interrogated him for more than five hours; the troopers were armed; troopers did not advise him he "was the sole target of the investigation and that his purposed inconsistent stories was inferred as a consciousness of his guilt"; he invoked his right to remain silent one hour into the interrogation; troopers ignored his invocation and continued to "aggressively" question him; and troopers did not allow Attorney Bacher, retained by Mr. Becker's parents, to see Mr. Becker or tell Mr. Becker of his presence at the barrack.

But the state trial court heard testimony refuting Mr. Becker's version of the circumstances: Mr. Becker voluntarily committed himself and then checked himself out of a psychiatric facility; Mr. Becker voluntarily arrived at the police barracks a day after Trooper Roberts went to the Becker home; while the interview room is not an area where "the public can walk in," there are "multiple exits from where he [Mr. Becker] was" and "there is no lock on any door keeping anyone in";[136] the interview room has one door with a window and another window; Mr. Becker, then over eighteen years old, never asked to speak with his father; and Corporal Courtright told Mr. Becker at the reason for the second interview is because of "problems with his first statement to us and inconsistencies that we found from talking to him, from the crime scene, and then other witnesses or, you know, friends, et cetera, through the investigation."

Against this factual backdrop but without the benefit of evaluating the witness credibility in two different versions of the events, we address: the circumstances surrounding the interrogation and, given the circumstances, would a reasonable person have felt "not at liberty to terminate the interrogation and leave."[137] We afford the state court's factual findings regarding the circumstances surrounding the interrogation a presumption of correctness under section

2254(d). The parties briefed these issues.[138] The trial court heard evidence regarding the circumstances surrounding the August 18, 2011 interrogation and found (a) Mr. Becker came to the Ephrata barracks voluntarily and (b) Mr. Becker never asked to leave or attempted to leave.

The second question, whether a reasonable person would have felt not at liberty to terminate the interrogation and leave, is a mixed question of law and fact requiring our independent review of the state court's finding Mr. Becker not in custody during the August 18, 2011 interview. We must apply an objective test to determine whether a reasonable person would have felt "not at liberty" to terminate the August 18, 2011 interview.  Considering the relevant factors—location of the questioning, duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning—we conclude the August 18, 2011 interview is "consistent with an interrogation environment in which a reasonable person would have felt free to terminate the interview and leave."[139]

We ordered the Commonwealth produce the video recording of the August 18, 2011 interview. Our independent reviews (several times) of this August 18, 2011 interview confirm the interview was not custodial. Trooper Roberts and Officer Courtright, dressed in suits but wearing their sidearms, never removed their weapons. There is no evidence, besides Mr. Becker's characterization, of being "taken to a remote and secure part of the state police barracks into a windowless room …." Trooper Roberts testified the door to the interview room has a window in it. Reviewing the video, sounds of other people talking and walking, presumably other troopers and employees, can be heard in the hallway along with other sounds of work activity, hardly a "remote and secure part" of the barracks.  Mr. Becker complains of being held "incommunicado." But Mr. Becker, over the age of eighteen, was not a minor withheld from a

parent, and he concedes he had no idea his parents retained counsel for him.[140]   More importantly, Mr. Becker never asked to speak to anyone, including a lawyer.

Two factors possibly militate against this finding: (a) the interview lasted five hours and (b) at the conclusion of the interview, troopers arrested Mr. Becker. But the investigators took several breaks during the interview and Trooper Roberts offered Mr. Becker water or soda on several occasions and brought Mr. Becker cigarettes. There are multiple breaks in the interview where Trooper Roberts and Corporal Courtright left the room, sometimes for as long as thirty minutes, where Mr. Becker could have said he wanted to leave.  He never asked to leave.  He never tried to leave.

Viewing all the circumstances surrounding the August 18 interview, we cannot find, as an objective matter, a reasonable person would have felt not at liberty to terminate the interrogation and leave.  "Relief is available under § 2254(d)(1) only if the state court's decision is objectively unreasonable."[141] Mr. Becker does not satisfy the objectively unreasonable standard on the state court's custody finding for habeas relief.

> **2.    Even assuming Mr. Becker was in custody during the August 18 interview, there is no basis to find the state court misapplied established federal law in finding he did not unambiguously invoke his right to silence.**

Even assuming we found the trial court misapplied established federal law in finding Mr. Becker was not in custody when he made the statements during the August 18 interview, we could not find the trial court misapplied established federal law in finding he did not unambiguously invoke his right to silence in either of this two statements: "I don't know. I have nothing more to say 'cause no matter what I say, youse trying to make me something I'm not" and "OK. I'm done now."

In analyzing Mr. Becker's two statements, the trial court applied the Supreme Court's 2010 decision in *Berghuis v. Thompkins*.[142]   In *Berghuis*, police interrogated Thompkins, a suspect in a shooting.  Police read Mr. Thompkins his *Miranda* rights at the beginning of the interrogation.  Mr. Thompkins declined to sign a waiver of his rights. The interrogation began, but Mr. Thompkins never said he wanted to remain silent, or he did not want to talk with police, or he wanted an attorney.   Mr. Thompkins remained largely silent during the three-hour interrogation, with a few limited verbal responses such as "yeah," "no," or "I don't know," and occasionally nodding his head. Two hours and forty-five minutes into the interrogation, police asked Mr. Thompkins "Do you believe in God?" Mr. Thompkins responded, "yes."  Police then asked, "Do you pray to God?"  Mr. Thompkins responded, "yes."  Police asked, "Do you pray to God to forgive you for shooting that boy down?" Mr. Thompkins responded, "yes" and looked away.  Mr. Thompkins refused a written confession and the interrogation ended fifteen minutes later.

Police charged Mr. Thompkins with first-degree murder and other offenses. He moved to suppress the statements made during the interrogation, arguing he invoked his right to remain silent requiring police to immediately end the interrogation, he did not waive his right to remain silent, and his inculpatory statements were involuntary. The trial court denied the suppression motion, and a jury found Mr. Thompkins guilty of first-degree murder and other charges.  He appealed the trial court's suppression motion. The Michigan Court of Appeals rejected his *Miranda* claim, finding Mr. Thompkins did not invoke his right to remain silent and waived it. The Michigan Supreme Court denied review.

Mr. Thompkins filed a habeas petition in the United States District Court for the Eastern District of Michigan under 28 U.S.C. § 2254 raising claims including an alleged *Miranda*

violation.  The district court denied the petition, applying section 2254(d)(1)'s standard a federal court cannot grant a habeas petition unless the state court's adjudication on the merits is contrary to or involved an unreasonable application of clearly established federal law. The district court found Mr. Thompkins did not invoke his right to remain silent, police did not coerce him into making statements, and the Michigan Court of Appeals' decision is not unreasonable.

The United States Court of Appeals for the Sixth Circuit reversed, finding the state court's rejection of the *Miranda* claim an unreasonable application of clearly established federal law and an unreasonable determination of the facts. The court of appeals found Mr. Thompkins' silence for nearly three hours in response to questioning "offered a clear and unequivocal message to the officers" he "did not wish to waive his rights."[143]

The Supreme Court reversed the court of appeals. The Court held a suspect must invoke his *Miranda* right to counsel and to remain silent "unambiguously"; '[i]f an accused makes a statement concerning the right to counsel 'that is ambiguous or equivocal' or makes no statement, the police are not required to end the interrogation, or ask questions to clarify whether the accused wants to invoke his … *Miranda* rights."[144]  The Court found "no principled reason to adopt different standards for determining when an accused has invoked the *Miranda* right to remain silent and the *Miranda* right to counsel"; both must be unambiguous.[145]

Examining the interrogation, the Court found Mr. Thompkins "did not say that he wanted to remain silent or that he did not want to talk with the police. Had he made either of these simple, unambiguous statements, he would have invoked his 'right to cut off questioning.' Here he did neither, so he did not invoke his right to remain silent."[146]

The Court in *Berghuis* applied its rule in *Davis v. United States,* addressing the invocation of the right to counsel, to the right to remain silent: "Invocation of the *Miranda* right

to counsel 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.' But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, our precedents do not require the cessation of questioning."[147]

Applying the unambiguous invocation standard of *Berghuis*, the trial court concluded Mr. Becker's two statements—"I don't know. I have nothing more to say 'cause no matter what I say youse trying to make me seem like something I'm not" and "OK. I'm done now"—are not unambiguous or unequivocal invocations of his right to remain silent or of his right to counsel.[148] The trial court found compelling the fact Mr. Becker continued to engage troopers in conversation immediately following each alleged invocation, and, under *Berghuis*, the court can infer a waiver of *Miranda* rights based on his actions, continuing his conversation with the troopers.[149] The trial court found at no time in the interrogation did Mr. Becker unambiguously or unequivocally state he wished to invoke his right to remain silent or right to counsel and held Mr. Becker received and understood his *Miranda* warnings and did not invoke his *Miranda* rights.[150]

Mr. Becker argues the trial court "erred in failing to recognize this overt constitutional violation" and "[a]n examination of the record reveals that the state court's conclusions throughout this case that there was no *Miranda* violation was an incorrect application of *Miranda* and its progeny and based on an unreasonable determination of the facts."[151]

Reviewing the audio/video recording of the August 18, 2011 interview, Mr. Becker's first statement arose during questioning regarding the gun's grip safety feature. Troopers asked Mr. Becker about his statement he had his thumb on the hammer of the gun when it fired, including

the safety feature made it impossible for the gun to fire without having a thumb on the grip and if he knew how to clear a weapon and why he had the gun pointed at Ms. Walsh's head, which Mr. Becker denied.  After being confronted with inconsistencies, including the thumb on the hammer versus the grip safety feature, Mr. Becker stated: "I don't know. I have nothing more to say cause no matter what I say youse trying to make me seem like something I'm not." Troopers then left the room.  When Trooper Roberts returned to the interview room, he asked Mr. Becker if he would be willing to answer a few more questions.  Mr. Becker replied: "I'll do my best" and continued to answer the troopers' questions.

Mr. Becker's second statement arose in the context of Trooper Roberts' questioning regarding the paternity of the baby and Ms. Walsh's desire to leave Mr. Becker.  The questions and responses back and forth focused on Ms. Walsh's statements to others she wanted to leave and talked to others about leaving.  Trooper Roberts asked Mr. Becker why Ms. Walsh didn't leave to which Mr. Becker responded she could have left and had every opportunity to do so. Trooper Roberts asked Mr. Becker if his behavior "had her scared" to leave, referencing statements she made to others.  Mr. Becker responded, "I'd love to know who these people are." He then restated his belief Ms. Walsh could have left, and then said, "OK. I'm done now." Trooper Roberts left the room for approximately a half hour and returned with a cigarette for Mr. Becker and questioning continued.

But we must again remind Mr. Becker of our limited scope of review.  We are not here to second-guess close calls on admissible evidence if consistent with federal law. We bring our analysis back to the standard applied to our review of a habeas petition: a determination of a factual issue made by a state court is presumed to be correct; the petitioner has the burden of rebutting the presumption by clear and convincing evidence; and a state court's determination a

claim lacks merit precludes federal habeas relief as long as "fair-minded jurists" could disagree on the correctness of the decision. Our Court of Appeals has not yet addressed *Berghuis*. A search of decisions within the circuit show statements such as: "How can I find a lawyer?" objectively is not an unambiguous request for the assistance of counsel;[152] and "Is this being recorded?" is not an unambiguous invocation of the right to counsel or to remain silent.[153]

Courts construe statements such as "I have nothing more to say" and "I'm done" both ambiguous and unambiguous invocations of the right to remain silent after *Berghuis*. For example, the United States District Court for the Eastern District of Kentucky concluded a suspect's statement: "I'm done" and "I'm done, man" is not an unambiguous invocation of the right to remain silent.[154] Other district courts found similar statements such as "I don't want to talk ... I don't know nothing about this, see. … I don't know nothing about this stuff. So, I don't even want to talk about this";[155] and  "I've got noth'n else to say—what I've already told you guys is what I wanna say"[156] are not an unambiguous invocation to cut off further questioning. On the other hand, some district courts find statements such as "I'm done talking";[157] "I have nothing more to say" and "I don't need to say anymore";[158] and "I got nothin[g] more to say to you. I'm done. This is over" are unambiguous invocations of the right to remain silent.[159]

Mr. Becker's first statement arose in the context of the troopers' questioning whether Mr. Becker's earlier statement he had his finger on the hammer of the gun when it went off and the gun's grip safety feature that would have prevented the gun to fire if his thumb is not on the grip, a discussion about how a weapon is cleared of ammunition, and whether he pointed the gun at Ms. Walsh.  At the end of this line of questioning, Mr. Becker responded, "I don't know. I have nothing more to say 'cause no matter what I say youse trying to make me seem like something I'm not." This statement arose in the context of a disagreement with the troopers regarding how

the gun could have gone off if, as Mr. Becker stated, his thumb had been on the hammer and not the grip and had nothing more to say on the topic. A reasonable officer would not have understood this statement as unambiguous or unequivocal invocation of his right to remain silent. After making this statement, Trooper Roberts left the room and when he returned, asked Mr. Becker if he would answer more questions to which Mr. Becker responded, "I'll do my best" and continued answering questions. This does not demonstrate an invocation of the right to remain silent.

The second statement, "OK. I'm done now," is a closer call. It arose after a line of questioning regarding the paternity of the baby and Ms. Walsh's intention to leave Mr. Becker as she expressed to others. When asked if Ms. Walsh wanted to leave, Mr. Becker responded "she had every opportunity" to do so and did not. Trooper Roberts pressed Mr. Becker on his behavior making her scared to leave, as she apparently expressed to others. Mr. Becker responded, "I'd love to know who these people are" and then said, "OK. I'm done now."[160]  Trooper Roberts left the room for around thirty minutes and returned with a cigarette for Mr. Becker. Trooper Roberts began questioning and Mr. Becker responded.  Mr. Becker did not say he wanted to remain silent.  He voluntarily continued speaking with the troopers.

Trooper Roberts asked Mr. Becker, "Are you sure the baby is yours?" to which Mr. Becker responded, "Oh, I'm positive."[161] Corporal Courtright and Trooper Roberts told Mr. Becker "people" told them Ms. Walsh "was trying to find a way out" of the relationship, and asked other people if she could move in with them.[162] Mr. Becker responded he would "love to know who these people are" and "right now, you're just saying a lot more people than I even knew she talked to."[163]  When Trooper Roberts pressed Mr. Becker "he had her scared" to even leave, Mr. Becker said, "OK. I'm done now."[164]

We cannot find the trial court erroneously or incorrectly applied clearly established federal law. There appears to be no clearly established federal law describing this statement as unambiguously invoking the right to silence. The trial court found this statement not to be clearly unambiguous.  It is closer to the line than the first statement and we might have, on a *de novo* review, found the statement unambiguous.  But we "may not issue the writ [of habeas corpus] simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."[165] The standard does not allow us to revisit the findings unless we are confident the trial court misapplied established federal law.  We conclude the trial court did not misapply clearly established federal law.[166]

### B.    Mr. Becker cannot sustain his Rule 404(b) grounds.

Mr. Becker next challenges the admission at trial of the testimony of the Detwiler sisters, Megan Walsh, and Gregory Miller under Pennsylvania Rule of Evidence 404(b)(2).  Mr. Becker contends the prejudicial impact of the witnesses' testimony to his "prior bad acts" outweighed its probative value and deprived him of a fair trial under the Sixth Amendment and due process under the Fifth and Fourteenth Amendments.  He argues the Commonwealth's reference to this testimony in closing argument, "encourag[ing] the jury to conclude that Mr. Becker acted in conformity with his poor character at the time of the shooting," compounded the prejudice.

In response, the Commonwealth makes two arguments: (1) Mr. Becker failed to exhaust his constitutional argument in the state court and any such claim is now procedurally defaulted; and (2) even if properly exhausted, the probative value of the testimony outweighs its prejudice where, as here, evidence of Mr. Becker's state of mind is relevant to his defense of an accidental, rather than intentional, killing.

36

1.     **Mr. Becker exhausted his challenge to Gregory Miller's testimony but
        failed to exhaust his challenge to the Detwilers' and Meghan Walsh's
        testimony.**

Under section 2254(b)(1), we many not grant a writ of habeas corpus "unless it appears
that – (A) the applicant has exhausted the remedies available in the courts of the State; or (B)(i)
there is an absence of available State corrective process; or (ii) circumstances exist that render
such process ineffective to protect the rights of the applicant."[167]   "[A] state prisoner must 'give
the state courts one full opportunity to resolve any constitutional issues by invoking one
complete round of the State's established appellate review process.'"[168]

A claim is exhausted if the petitioner "fairly presented" it to the state courts.[169] A claim is
"fairly presented" if the petitioner "presented the same factual and legal basis for the claim to the
state courts."[170] "In Pennsylvania, a defendant 'exhausts his state remedies for a federal claim
either by raising the claim on direct appeal or in a petition for collateral relief under the
PCRA.'"[171] "While failure to exhaust claims usually requires a district court to dismiss a habeas
petition without prejudice so that a petitioner can return to state court to exhaust his claims,
where state law forecloses review of unexhausted claims—as happens when the PCRA statute of
limitations has run—the claims are considered procedurally defaulted."[172]

The Commonwealth argues Mr. Becker did not challenge the admission of the Rule
404(b) evidence on Sixth or Fourteenth Amendment constitutional grounds, or any federal law,
in state court; he instead argued to the Pennsylvania Superior Court the trial court erred in
admitting testimony under Pennsylvania evidentiary law. The Commonwealth cites to Mr.
Becker's brief to the Superior Court in his direct appeal, arguing he failed to present his fair trial
and due process constitutional arguments.[173] The Commonwealth argues Mr. Becker failed to
exhaust his constitutional claims and they are now procedurally defaulted because his sentence

became final in 2015 and the time for pursuing an appeal with the Pennsylvania Supreme Court expired.  The Commonwealth argues a post-conviction petition must be brought within one year of the judgment of sentence becoming final and is now procedurally defaulted.

Mr. Becker responds he "challenge[d] this issue in the state court on due process grounds," citing the trial court's Rule 1925(a) opinion and his brief in the Superior Court in his direct appeal.[174]  Mr. Becker directs us to a page of his brief in the Superior Court in his direct appeal.[175]  This portion of his brief to the Superior Court is a due process argument regarding the testimony of Gregory Miller.[176]  He does not direct us to any portion of his brief arguing due process violations with regard to the testimony of the Detwiler sisters or Megan Walsh.  With regard to Gregory Miller's testimony, Mr. Becker argued because the Commonwealth failed to give notice of Mr. Miller's testimony until after the selection of nine jurors, including one African American juror, it violated his due process rights.  Mr. Becker based his due process claim on the lack of notice of Mr. Miller's testimony which he argued injected "racial bigotry into the case."[177]

Rejecting Mr. Becker's argument of a due process violation by forcing him to trial with a jury selected before knowing Mr. Miller's testimony, the trial court concluded:

> Finally, [Mr.] Becker argues his Due Process Rights were violated by forcing him to proceed to trial with a jury that was selected without knowledge of [Mr.] Miller's testimony and without the opportunity to voir dire potential jurors about the content of [Mr.] Miller's testimony. Specifically, [Mr.] Becker refers to the testimony involving racial bias and domestic violence. [Mr.] Miller testified that he had observed [Mr.] Becker and [Ms.] Walsh together on numerous occasions, during which he observed [Mr.] Becker acting cruelly and abusively toward [Ms.] Walsh. According to [Mr.] Miller, this abusive behavior consisted of [Mr.] Becker threatening to "pistol whip" and "back hand" [Ms.] Walsh, as well as [Mr.] Becker using various slurs toward [Ms.] Walsh, including the word "n[*****]." Becker avers that his inability to voir dire potential jurors about the content of Miller's testimony violated his Due Process Rights.[178]

38

The trial court concluded Mr. Miller's testimony did not violate his due process rights, agreeing with the Commonwealth the word "n*****" is not racially derogatory under the circumstances because Ms. Walsh is not African American and "[a]ny reasonable juror would understand [Mr.] Becker's use of the word 'n*****' is not racially motivated."[179]

We conclude Mr. Becker fairly presented to the Pennsylvania Superior Court a notice and due process argument about the testimony of Gregory Miller.  Mr. Becker fails to cite us his brief raising Sixth and Fourteenth Amendment arguments with regard to the testimony of the Detwilers or of Megan Walsh.[180] He did not fairly present constitutional claims regarding the Detwilers' and Megan Walsh's testimony. He failed to exhaust those claims and they are procedurally defaulted.

### 2. Even if properly exhausted, the Pennsylvania Superior Court did not err in affirming the proper admission of testimony under Rule 404(b).

Even if Mr. Becker exhausted constitutional claims on all Rule 404(b) testimony, we find the Pennsylvania Superior Court's decision is not contrary to clearly established law.

Mr. Becker objects the admitted testimony of the Detwilers, Megan Walsh, and Gregory Miller of prior bad acts under Rule 404(b) is unreliable and irrelevant and highly prejudicial denying his right to a fair trial. The Commonwealth argues the Rule 404(b)(2) evidence is relevant to Mr. Becker's motive and rebutting his defense of an accidental shooting. The Commonwealth argues the Superior Court correctly found the Rule 404(b) evidence more probative than prejudicial and there is no basis to disturb its ruling.

At the time of Mr. Becker's trial, Pennsylvania Rule of Evidence 404(b) prohibited admission of  "crimes, wrongs, or acts … to prove the character of a person in order to show action in conformity therewith."[181]  Such evidence "may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake

or accident."[182]  In criminal cases, such evidence may be admitted "only upon a showing that the probative value of the evidence outweighs its potential for prejudice."[183]

Mr. Becker objects the Detwilers' testimony is too remote in time; the sisters testified to Mr. Becker's actions occurring three years before the shooting of Ms. Walsh, including testimony of his shooting Danielle Detwiler with a "toy" Airsoft gun and one occasion where he pointed a "broken" gun at her.  He objects to Megan Walsh's testimony regarding her Facebook chat with Allison Walsh where she expressed her fear Mr. Becker would pull a gun on her.

Mr. Becker makes a two-pronged argument as to Gregory Miller's testimony.  First, Mr. Becker objects to admission of Mr. Miller's testimony he observed Mr. Becker verbally abuse Ms. Walsh by referring to her as a "bitch, a slut, a whore, and on more than one occasion, stronger terms like c*** or a n*****"; Mr. Becker "would frequently remind [Ms. Walsh] that he had firearms and ammunition when he was angry with her"; recalled Mr. Becker "threaten[ed] to pistol whip [Ms. Walsh] on one occasion"; and would "raise[] his hand … as if he was going to backhand her or occasionally closed fist pulled back[.]"[184]  Mr. Becker argues Mr. Miller's testimony is temporally remote, contending Mr. Miller last saw Mr. Becker and Ms. Walsh two to four weeks before the shooting, and testimony Mr. Miller heard Mr. Becker call Ms. Walsh a "n*****" is unfairly prejudicial because an African American juror, already seated, would likely find this word offensive.

Mr. Becker's second objection to Mr. Miller's testimony is lack of notice depriving him of due process. The Commonwealth did not learn of Mr. Miller's information until he contacted the District Attorney on the first day of jury selection, Monday, February 25, 2013. State troopers interviewed Mr. Miller on the evening of Wednesday, February 27. The next day, Thursday, February 28, 2013, Commonwealth filed a "Second Supplemental Notice of Intention

to Introduce Evidence of Other Crimes, Wrongs or Acts Pursuant to Pennsylvania Rule of Evidence 404(b)" notifying Mr. Becker's trial counsel the Commonwealth intended to introduce Mr. Miller's testimony.  By the time the Commonwealth filed its Second Supplemental Notice, nine jurors had been selected, including one African American juror. Mr. Becker argues this created unfair prejudice in violation of his constitutional right to a fair trial and due process.

The Pennsylvania Superior Court reviewed the testimony of the Detwilers, Megan Walsh, and Gregory Miller.  On the remoteness argument regarding the Detwilers' testimony, the Superior Court agreed with the trial court Mr. Becker's prior gun-pointing behavior is not unduly temporally remote and is probative on the issue of accident or mistake and the degree of guilt in this case.[185]

The Superior Court found Mr. Miller's testimony relevant to rebut Mr. Becker's defense of an accidental shooting and his statements to troopers professing his love for Ms. Walsh and their unborn child and found the probative value is not outweighed by prejudice.[186] The Superior Court rejected Mr. Becker's second argument regarding lack of notice of Mr. Miller's testimony. The Superior Court reasoned Pennsylvania's Rule of Evidence 404(b)(3) allows notice even during trial on a showing of good cause to the trial court. The Superior Court found the Commonwealth's second notice, filed during jury selection, of Mr. Miller's testimony it received only a few days earlier constitutes "good cause."[187]

Finally, the Superior Court addressed Mr. Becker's due process argument regarding Mr. Miller's use of the word "n*****" as creating a racial bias with an African American juror.  The trial court rejected Mr. Becker's argument.  The Superior Court affirmed the trial court's reasoning and noted Mr. Becker's counsel failed to object to Mr. Miller's use of the term and could have, but did not, request to voir dire the jurors regarding the effect of the word.[188]

> **(a)     The Pennsylvania Superior Court finds Megan Walsh's testimony Facebook conversation hearsay but applies a harmless error analysis.**

With regard to Megan Walsh's testimony about the Facebook chat with her sister Allison, the Superior Court found it improperly admitted under the hearsay rule.[189]   But the Superior Court applied a harmless error analysis concluding properly admitted evidence of Mr. Becker's guilt as to render the prejudicial effect of Megan Walsh's testimony insignificant.

We apply *Brecht* to the Superior Court's harmless error determination of Megan Walsh's testimony.[190]   Mr. Becker must show error "had a substantial and injurious effect or influence in determining the jury's verdict."[191]   Where, as here, the Superior Court found the error is harmless beyond a reasonable doubt on direct review, "we must defer to its determination under the framework established by" AEDPA.[192]

The Superior Court explained: the "significance of the cartridge recovered in the chamber [of the gun used to kill Ms. Walsh] is that the magazine must have been in the gun for the next cartridge to have been chambered after [Ms.] Walsh was shot. When [Mr.] Becker was first interviewed in the early hours of August 13, 2011, he told police the shooting was an accident based upon his claim there was no magazine in the gun and he believed the gun was empty. However, when the gun was recovered, a live cartridge was in the chamber. The fact that there was a cartridge in the chamber after the gun had been fired disproved [Mr.] Becker's statement to police that the magazine was not in the gun at the time of the shooting. In light of this critical evidence, which fully supports the Commonwealth's theory that [Mr.] Becker knowingly pointed a loaded gun at [Ms.] Walsh, we conclude the admission of Megan Walsh's testimony of her sister's Facebook statements was harmless error."[193]

Applying the AEDPA standard, we may not grant Mr. Becker's writ under section 2254(d) unless the Superior Court's decision is (1) "contrary to, or involved an unreasonable application of, clearly established [f]ederal law, as determined by the Supreme Court of the United States," or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the [s]tate court proceeding."  For all the reasons discussed, Mr. Becker does not meet his burden under section 2254(d).

It is well settled "federal habeas corpus relief does not lie for errors of state law" and "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."[194]  We properly focus only on "whether a conviction violated the Constitution, laws, or treaties of the United States."[195] "Admission of 'other crimes' evidence provides a ground for federal habeas relief only if 'the evidence's probative value is so conspicuously outweighed by its inflammatory content, so as to violate a defendant's constitutional right to a fair trial.'"[196]

The Pennsylvania Superior Court considered all of Mr. Becker's alleged evidentiary errors and concluded his claims lacked merit.

> **(b)     The Pennsylvania Superior Court's ruling on the evidentiary issues does not violate due process.**

We are not to reexamine state-court determinations of state-law questions, here Pennsylvania's Rules of Evidence. Mr. Becker argues the prior bad act evidence admitted by the trial court under Pennsylvania Rule of Evidence 404(b) violated his right to a fair trial under the Sixth Amendment and the due process clause of the Fifth and Fourteenth Amendments.

Mr. Becker fails to identify a clearly established Supreme Court precedent the admission of prior bad acts evidence constitutes a violation of due process.  He argues "[c]ertain evidentiary rulings can rise to a due process violation," citing *Chambers v. Mississippi*[197] and *Dowling v.*

*United States*.[198] Neither is persuasive here; *Chambers* did not address prior bad acts and *Dowling*, involving Federal Rule of Evidence 404(b), found no due process violation.

Admission of "other crimes" evidence is a basis for federal habeas relief only if "the evidence's probative value is so conspicuously outweighed by its inflammatory content, so as to violate a defendant's constitutional right to a fair trial."[199]  "The question is whether [the prior bad acts] testimony 'in the context of the entire trial, w[as] sufficiently prejudicial to violate [his] due process rights."[200]

Mr. Becker objects to the testimony of the Detwiler sisters: Danielle Detwiler testified at trial to instances when Mr. Becker pointed a handgun at her multiple times; while the initial instances were done jokingly, "other times [Mr. Becker] would get erratic and angry"; and Mr. Becker shot her more than ten times on various parts of her body with an air-soft/BB gun when he became angry.[201] Devon Detwiler testified she saw Mr. Becker with airsoft/BB guns and saw him shoot her sister with an air-soft/BB gun on multiple occasions when he became angry.[202] Mr. Becker argues the court allowed the Detwilers to testify about events occurring three years earlier.

Mr. Becker objects to Megan Walsh's testimony regarding her Facebook message with Allison Walsh.  As discussed above, the Pennsylvania Superior Court in Mr. Becker's direct appeal found this testimony hearsay, but concluded it was harmless error.

Mr. Becker objects to Gregory Miller's testimony as temporally remote, arguing Mr. Miller last saw Ms. Walsh and Mr. Becker for at least two to four weeks prior to the shooting. Mr. Becker also objects to Mr. Miller's testimony he heard Mr. Becker call Ms. Walsh "n*****" which he alleges would have offended an African American juror.

The Commonwealth responds Mr. Becker's state of mind "was the critical factor at trial," and the Rule 404(b) evidence "was directly relevant to addressing [his] motive and rebutting his proffered defense that the shooting was accidentally."[203]

On Mr. Becker's direct appeal, the Pennsylvania Superior Court concluded Mr. Becker's prior gun-pointing behavior as testified by the Detwiler sisters "was not unduly remote and was probative to the issue of accident or mistake and degree of guilt in this case."[204] The Superior Court found Gregory Miller's testimony he observed Mr. Becker "act abusively toward the victim in 2011 was relevant to rebut the defense's characterization of the relationship and the shooting."[205]   It found no merit in Mr. Becker's argument regarding the Commonwealth's alleged failure to provide notice of Mr. Miller's testimony. The Superior Court found Pennsylvania Rule 404(b)(3) requires the prosecution to provide "reasonable notice in advance of trial, ***or during trial if the court excuses notice on good cause shown***, of the general nature of any such evidence the prosecutor intends to introduce at trial." The court found the Commonwealth filed a second supplemental notice of its intention to introduce Rule 404(b) evidence through Mr. Miller during jury selection after Mr. Miller contacted the Commonwealth regarding his information.   The trial court found "good cause" based on the late date the Commonwealth received evidence, and the Superior Court agreed.[206]

With regard to Mr. Miller's use of "n*****", the Superior Court, citing the record, noted the Commonwealth's attorney told the trial court he instructed Mr. Miller "[u]sing any racial pejoratives is out," but Mr. Miller used the word in his testimony.[207] The Superior Court characterized Mr. Becker's argument as an attempt to use Mr. Miller's unanticipated trial testimony to challenge the trial court's pre-trial Rule 404(b) order. The trial court rejected Mr. Becker's argument, finding evidence elicited from Mr. Miller did not violate Mr. Becker's due

process rights. The Superior Court emphasized at the time Mr. Miller used the epithet in his testimony, Mr. Becker's counsel did not object or move for a mistrial, and counsel could have, but did not, request to voir dire the jurors.  The Superior Court concluded Mr. Becker's argument of the effect of the "N" word on the jurors "is speculation at this juncture" and denied him relief.[208]

Mr. Becker does not explain or argue how the probative value of the testimony is "so conspicuously outweighed by its inflammatory content" to violate his constitutional right to due process and a fair trial.  He simply reasserts his arguments made to the Pennsylvania Superior Court which rejected them.[209]  Mr. Becker fails to show, and we cannot find, how these alleged errors deprived him of a fair trial.  We deny Mr. Becker's habeas petition on this ground.

### C.  Mr. Becker cannot sustain an ineffective assistance of counsel argument.

Mr. Becker makes four ineffective assistance of counsel claims rejected by the Superior Court: his trial counsel failed to  (1) file a motion to suppress his statements at the August 18, 2011 interview based on an invalid *Miranda* waiver in denying him access to Attorney Bacher; (2) object to testimony of Corporal Courtright's improper legal opinion of a voluntary confession; (3) request a *corpus delicti* instruction; and (4) request a cautionary instruction explaining the limited use of Rule 404(b) prior bad acts evidence.

When assessing claims of ineffective assistance of counsel, we apply the two-prong standards of *Strickland v. Washington* requiring a petitioner to show deficient performance and prejudice.[210]  "Under *Strickland*, a petitioner must first establish that counsel's performance 'fell below an objective standard of reasonableness.'  In making this determination, *Strickland* cautioned that courts should be 'highly deferential' when assessing counsel's performance and requires courts to 'indulge a strong presumption that counsel's conduct falls within the wide

range of reasonable professional assistance.' Second, a petitioner must show that he was prejudiced by counsel's deficient performance, meaning that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'"[211]

The Pennsylvania Supreme Court "refined the *Strickland* performance and prejudice test into a three-part inquiry. To prove counsel ineffective, the petitioner must show that: '(1) the underlying legal issue has arguable merit; (2) counsel's actions lacked an objective reasonable basis; and (3) actual prejudice befell petitioner from counsel's act or omission.'"[212] Our Court of Appeals "previously ruled that Pennsylvania's test for assessing ineffective assistance of counsel claims is not contrary to *Strickland*."[213]

We review Mr. Becker's ineffective assistance claims "through the lens" of section 2254; "we cannot disturb a ruling of the state court unless it 'was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[,]' or it 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'"[214] We give the state court "wide deference to the state court's conclusions, disturbing them only if the state court unreasonably applied ... the prongs of Strickland."[215] "The ultimate question is whether counsel's performance fell below 'an objective standard of reasonableness,'" a "deferential standard that becomes 'doubly' so when combined with the deferential" standard under section 2254.[216]

> **1.   Motion to suppress the August 18, 2011 interview for denial of access to Attorney Bacher.**

Mr. Becker first argues ineffectiveness of counsel for failing to file a motion to suppress the August 18, 2011 interview because police denied him access to Attorney Bacher.  Mr. Becker acknowledges trial counsel filed a motion to suppress the August 18 interview based on his two

statements he alleges invoked his right to remain silent, but now asserts an invalid *Miranda* waiver based on being deprived representation by Attorney Bacher.

The post-conviction court concluded Mr. Becker's claims lacked merit because troopers gave him his *Miranda* warnings at the August 18 interview, Mr. Becker did not request a lawyer, Mr. Becker did not know of Attorney Bacher's present at the barracks, and Mr. Becker's parents cannot invoke his right to counsel, making Attorney Bacher's testimony at the suppression hearing irrelevant.[217]

The Pennsylvania Superior Court agreed with the post-conviction court's reasoning. The Superior Court's reasoning is grounded in the United States Supreme Court's decision in *Moran v. Burbine*.[218] In *Moran*, a defendant confessed to murder during a police interrogation after being given his *Miranda* rights and executing waivers. While in custody and unknown to defendant, his sister arranged for an attorney to represent defendant. The attorney telephoned the police station and police advised the attorney defendant would not be questioned further until the next day. Instead, the ongoing interrogation yielded the confession.[219] The Court granted *certiorari* "to decide whether a prearraignment confession preceded by an otherwise valid waiver must be suppressed either because the police misinformed an inquiring attorney about their plans concerning the suspect or because they failed to inform the suspect of the attorney's efforts to reach him."[220]

The Court held the failure by police to inform defendant of the attorney's phone call did not invalidate his otherwise valid *Miranda* waiver: "Events occurring outside of the presence of the suspect and entirely unknown to him surely can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right. Under the analysis of the Court of Appeals, the same defendant, armed with the same information and confronted with precisely the

same police conduct, would have knowingly waived his *Miranda* rights had a lawyer not telephoned the police station to inquire about his status. Nothing in any of our waiver decisions or in our understanding of the essential components of a valid waiver requires so incongruous a result. No doubt the additional information would have been useful to respondent; perhaps even it might have affected his decision to confess. But we have never read the Constitution to require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights. Once it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law."[221]

The Court further rejected the court of appeals' finding police acted with "deliberate or reckless irresponsibility":  "Nor do we believe that the level of the police's culpability in failing to inform respondent of the telephone call has any bearing on the validity of the waivers. In light of the state-court findings that there was no 'conspiracy or collusion' on the part of the police, we have serious doubts about whether the Court of Appeals was free to conclude that their conduct constituted 'deliberate or reckless irresponsibility.'   But whether intentional or inadvertent, the state of mind of the police is irrelevant to the question of the intelligence and voluntariness of respondent's election to abandon his rights. Although highly inappropriate, even deliberate deception of an attorney could not possibly affect a suspect's decision to waive his *Miranda* rights unless he were at least aware of the incident. Nor was the failure to inform respondent of the telephone call the kind of "trick[ery]" that can vitiate the validity of a waiver. Granting that the 'deliberate or reckless' withholding of information is objectionable as a matter of ethics, such conduct is only relevant to the constitutional validity of a waiver if it deprives a

defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them. Because respondent's voluntary decision to speak was made with full awareness and comprehension of all the information *Miranda* requires the police to convey, the waivers were valid."[222]

Here, the Superior Court applied *Moran* and Pennsylvania cases adopting *Moran* and rejecting claims of an invalid *Miranda* waiver because police failed to inform a defendant of an attorney's attempt to contact him.[223]  Mr. Becker attempts to distinguish *Moran* based on its facts and because his habeas petition claiming ineffective assistance of counsel is based on the "failure to raise a motion to suppress found upon an invalid *Miranda* waiver where Mr. Becker was denied access to counsel under controlling ***state law***."[224]

Mr. Becker's burden under section 2254(d) is to show the Pennsylvania Superior Court's decision is contrary to, or unreasonably applied, clearly established federal law as determined by the Supreme Court. The Supreme Court's decision in *Moran* is applicable here and the Pennsylvania Superior Court applied it.  We deny Mr. Becker's ineffective assistance claim on this ground.

### 2.    Failing to object to Corporal Courtright's opinion.

Mr. Becker claims ineffective assistance of trial counsel for failing to object to Corporal Courtright's testimony Mr. Becker voluntarily made his statement at the August 13, 2011 interview.  Mr. Becker objects to Corporal Courtright's testimony as improper legal opinion:

> Q.  To the best of your knowledge, was Matthew Becker's agreement to provide a statement a free and voluntary act?
>
> A.  Yes.
>
> Q.  If you had determined that Matthew Becker's agreement was not a free and voluntary act, would you have proceeded with the interview?

A.  No.[225]

At the post-conviction hearing, Attorney Charles testified regarding his decision not to object to Corporal Courtright's testimony:

> Q.  What I'm getting at is, at one point in time during trial, Corporal Courtright testified regarding his belief that the confession he got – or the statements he got, rather, from Mr. Becker were voluntary.
>
> A.  Well, I read that in your petition. This issue of voluntariness of the confession had been preserved at pretrial hearing. We had attacked the voluntariness of the confession but the ruling was against us.  What we wanted to convey to the jury was that he did go to the police station on two occasions, waived his *Miranda* rights and was cooperating with police, because this was an accident, not an intentional killing. So in him saying to the jury that it was a voluntary statement, well, the Court had already ruled that that was the case. Essentially, I'm going to try to make the best out of that as I can, you know, turn lemons into lemonade; try to argue that he is being cooperative with the police. So if that statement was made, and I'm certain it was, it wasn't something that was a key point to me.
>
> Q. So the record would reflect no objection. My next question would be, what, if any, strategic reasons did you have for not objecting? Was it the reason you just gave?
>
> A. Yes. Because I don't know whether it was in my opening or closing, but we were trying to convey to the jury that this was an accident, that he wasn't hiding anything. He didn't seek the assistance of counsel. He spoke to them for hours in two separate interviews and he cooperated with them, and it was an attempt to be cooperative with them. It was voluntary actions on his part. The actual legal aspect, whether it was a voluntary waiver had been litigated in pretrial proceedings and preserved.
>
> Q. Would you agree with me that the voluntariness was also an issue at trial?
>
> A.  I don't believe the voluntariness was an issue for purposes of the presentation to the jury. It was an issue prior to trial. Once ruled upon by [the trial judge], we tried to make best of what the ruling was.[226]

The post-conviction court determined trial counsel articulated a clear strategic reason for his action he elected to follow at trial and denied the ineffective assistance claim.[227] The Pennsylvania Superior Court affirmed, concluding Attorney Charles articulated a reasonable basis for declining to object to Corporal Courtright's testimony—the development of an

accidental shooting defense and an intention to convey to the jury Mr. Becker cooperated with the police investigation and had nothing to hide.

In reviewing the post-conviction court's determination of a reasonable basis for trial counsel's action, the Superior Court recognized: "[g]enerally, where matters of strategy and tactics are concerned, counsel's assistance is deemed constitutionally effective if he chose a particular course that had some reasonable basis designed to effectuate his client's interests. A finding that a chosen strategy lacked a reasonable basis is not warranted unless it can be concluded that an alternative not chosen offered a potential for success substantially greater than the course actually pursued."[228]   The Superior Court concluded Mr. Becker's "boilerplate argument" failed to demonstrate the unreasonableness of Attorney Charles's explanation and found "no basis in the record to conclude that there was any greater potential for success in objecting to the Corporal's passing reference to [Mr. Becker's] waiver of his *Miranda* rights."[229]

Pennsylvania's test for assessing ineffective assistance of counsel claims is not contrary to *Strickland*, and factual determinations made by the state court are presumed to be correct absent clear and convincing evidence to the contrary.[230] Mr. Becker fails to show the Pennsylvania Superior Court's decision is an unreasonable application of *Strickland* or trial counsel's decision not to object to Corporal Courtright's testimony lacked a reasonable basis. We deny Mr. Becker's ineffective assistance claim on this ground.

### 3.    Failing to request a *corpus delicti* instruction.

Mr. Becker argues ineffectiveness of trial counsel for failing to request a *corpus delicti* jury instruction where trial counsel based the defense on an accidental shooting.[231] He argues failure to request the instruction "all but conceded a finding on the *corpus delicti* issue" and he must be granted a new trial.[232]

"Under Pennsylvania's *corpus delicti* rule, the Commonwealth must prove beyond a reasonable doubt that the charged crime has been committed before using the defendant's inculpatory statements to connect [him] to the crime."[233] The *corpus delicti* rule is a rule of evidence and "places the burden on the prosecution to establish that a crime has actually occurred before a confession or admission of the accused connecting him to the crime can be admitted. The Commonwealth need not prove the existence of a crime beyond a reasonable doubt as an element in establishing the *corpus delicti* of a crime, but the evidence must be more consistent with a crime than with [an] accident."[234] "The *corpus delicti* in a homicide case consists of proof 'that the person for whose death the prosecution was instituted is in fact dead and that the death occurred under circumstances indicating that it was criminally caused by someone.'"[235]

Under Pennsylvania law, establishing the *corpus delicti* is a two-step process: "[t]he first step concerns the trial judge's admission of the accused's statements and the second step concerns the fact finder's consideration of those statements."[236] For a statement to be admitted, "the Commonwealth must prove the *corpus delicti* by a preponderance of the evidence, and for the statement to be considered by the fact finder, the Commonwealth must establish the *corpus delicti* beyond a reasonable doubt."[237]

At the post-conviction hearing, Attorney Charles (trial counsel) testified he did not ask for a *corpus delicti* jury instruction:

> "Because I didn't think it applied under the facts of the case. You had a woman that was seven months pregnant with a bullet between her eyes. You had the Commonwealth bringing in, over objection, 404(b) evidence to try and show absence of accident. I didn't think the corpus delicti rule was applicable under the facts of the case, so, no, it wasn't raised."[238]

The Pennsylvania Superior Court concluded the *corpus delicti* rule did not apply and, even if it applied and an instruction should have been given, Mr. Becker failed to demonstrate prejudice based on "the independent evidence establishing that it was more likely that [Ms.] Walsh was killed by a criminal act than by an accident."[239] The Superior Court found "ample independent evidence" establishing *corpus delicti*: Ms. Walsh suffered a gunshot wound to the forehead not self-inflicted; Mr. Becker was the only other person in the room; the gun's safety features made an accidental discharge unlikely if the magazine had been removed; although the gun did not have a magazine in it at the time of its recovery at the scene, first responders found an unfired cartridge loaded in the gun; and evidence established the gun almost fully loaded at the time of the shooting.[240] The Superior Court concluded this evidence—independent of Mr. Becker's statements—established it more likely discharge of the gun "was criminal rather than accidental because [Mr. Becker] knowingly pointed a loaded firearm at [Ms.] Walsh's head."[241] Considering the independent evidence, the Superior Court found Mr. Becker failed to show prejudice.[242]

Mr. Becker disagrees with the Pennsylvania Superior Court.  He argues the *corpus delicti* rule applies to all statements made by an accused, even exculpatory statements implicating the accused in a crime. He argues "[t]he *corpus delicti* instruction is critical to enable a jury to understand how to consider a defendant's statements, namely that the jury should not consider the statements until satisfied beyond a reasonable doubt of the *corpus delicti*."[243]  We assume this argument is directed to *Strickland's* performance prong. The post-conviction court concluded *corpus delicti* did not apply because it found Mr. Becker's statements of an accidental shooting exculpatory rather than inculpatory and, based on the ample evidence at trial, the jury

could find *corpus delicti* beyond a reasonable doubt without considering Mr. Becker's statements.

The Pennsylvania Superior Court disagreed with the post-conviction court's reasoning regarding an exculpatory statement. The Superior Court concluded "the mere fact that [Mr. Becker] asserted the shooting was accidental did not render the statement exculpatory for purposes of the *corpus delicti* rule."[244] The Superior Court found Mr. Becker's statements "contained averments that suggested a possible motive, including [his] statement that he intended to 'devil' [Ms.] Walsh, when she was ignoring him and reading her book."[245] Its disagreement with the post-conviction court notwithstanding, the Superior Court concluded "this is not a case where the traditional policies underlying the *corpus delicti* rule are implicated" based on the ample evidence as discussed above.[246]

The Pennsylvania Superior Court did not base its decision on an exculpatory/inculpatory distinction. It concluded the *corpus delicti* rule did not apply based on the other independent evidence for the jury's consideration. Mr. Becker fails to show how his trial counsel's representation fell below an objective standard of reasonableness based prevailing professional norms.

On *Strickland's* prejudice prong, Mr. Becker argues the failure to request a *corpus delicti* instruction "highly prejudicial." He argues both his trial counsel and prosecutors "were acutely aware of the import of Mr. Becker's inculpatory statements through the trial;" the trial court's instructions to the jury regarding his statements encompassed four pages (thus showing the importance of his statements); and the defense's strategy and theory of the case as an accidental shooting makes the failure to request the *corpus delicti* instruction advising the jury the

Commonwealth must prove the *corpus delicti* beyond a reasonable doubt "was fatal" requiring a new trial.[247]

Mr. Becker fails to meet *Strickland's* prejudice prong. He must show there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  Mr. Becker provides no other prejudice argument and does not address the "ample" independent evidence highlighted by the Pennsylvania Superior Court. He does not articulate how the Superior Court's denial of his ineffective assistance claim on *corpus delicti* is contrary to *Strickland*.

Under section 2254(d), our review of the Pennsylvania Superior Court's post-conviction merits decision is limited to determining whether the state court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[248] We find the Superior Court's decision does not run afoul of the standards of section 2254(d), and we deny Mr. Becker's ineffective assistance claim based on the failure to request a *corpus delicti* instruction.

### 4.    Failing to request a limiting instruction on Rule 404(b) evidence.

Mr. Becker claims ineffective assistance of trial counsel for failure to request a limiting instruction on Rule 404(b) evidence admitted through the testimony of Danielle Detwiler, Devon Detwiler, Megan Walsh, and Gregory Miller.

At the post-conviction evidentiary hearing, Attorney Holihan provided no explanation or strategic reason for failing to ask for a cautionary instruction on the Rule 404(b) evidence.[249] Attorney Holihan believed he asked for an instruction and believed the trial judge agreed he

would give a cautionary charge, but there is no dispute the trial court did not give a Rule 404(b) limiting or cautionary instruction to the jury.

Both the post-conviction court and the Commonwealth conceded, and the Superior Court agreed, Mr. Becker's ineffective assistance claim has arguable merit because Attorney Holihan failed to articulate a reasonable strategic basis for failing to request a cautionary instruction.[250] Accordingly, the Superior Court focused only on whether Mr. Becker established prejudice in his ineffectiveness claim.

Under Pennsylvania law, prejudice for purposes of an ineffectiveness of counsel claim is defined as: "[A] defendant [raising a claim of ineffective assistance of counsel] is required to show actual prejudice; that is, that counsel's ineffectiveness was of such magnitude that it 'could have reasonably had an adverse effect on the outcome of the proceedings.'"[251] "It is settled that the test for counsel ineffectiveness is the same under both the Pennsylvania and Federal Constitutions: it is the performance and prejudice test set forth in *Strickland*. . ."[252]

Against *Strickland's* prejudice standard, the Superior Court analyzed two Pennsylvania Supreme Court cases examining ineffectiveness of counsel claims for failing to request a cautionary instruction: *Commonwealth v. Billa*[253] and *Commonwealth v. Hutchinson*.[254] Each case represents the ends of the spectrum regarding prior bad acts evidence and prejudice from a failure to issue a cautionary instruction.

In *Billa*, the Pennsylvania Supreme Court found a "vivid" and "highly inflammatory" description by a prior rape victim of defendant on trial for murder "created the substantial danger that the jury could be swayed in its deliberations on the degree of guilt by this evidence showing [the defendant's] criminal character and his propensity to sexually assault young Hispanic females."[255]  While the court found the evidence relevant and admissible, it found trial counsel

ineffective for failing to request a cautionary instruction.[256]  The court concluded "[g]iven the highly inflammatory and extensive nature of the evidence of the prior sexual assault, we cannot say with any reasonable certainty that the jury would have returned the same verdict of murder of the first degree had it been properly instructed.[257]

In *Hutchinson*, the Pennsylvania Supreme Court rejected an ineffective assistance of counsel claim for failing to request a cautionary instruction on the admission of prior bad acts evidence.  Testimony in the murder trial included statements from the victim's sister the appellant assaulted the victim on an earlier occasion and attempted to force himself on her, testimony from a police officer one of defendant's former girlfriends obtained a protection from abuse order against him, testimony of a police officer defendant threatened to kill the victim's estranged husband, and testimony defendant used various aliases.[258] The court found the challenged bad acts evidence "not inflammatory, not graphic, and not extensive. Some of the evidence was elicited as a single sentence in passing during cross-examination of the witnesses by defense counsel."[259]  The court distinguished the bad acts evidence from *Billa*, and held the defendant failed to establish prejudice by "demonstrate[ing] that there is a reasonable probability that the outcome of his trial would have been different but for the lack of a limiting instruction" and, given the "overwhelming evidence" of defendant's guilt, defendant "failed to suggest how he could have been prejudiced by counsel's failure to request a limiting instruction such that there is a reasonable probability that the outcome of his trial would have been different."[260]

After analyzing both cases, the Pennsylvania Superior Court reasoned the prior bad acts evidence here is more like *Hutchinson* than *Billa*.[261]  It found evidence of Mr. Becker's prior bad acts, including his treatment of Danielle Detwiler, his use of an air soft gun against her, and evidence of Mr. Becker's verbal abuse and threats to Ms. Walsh, as testified by Mr. Miller, is

admissible to prove ill-will, absence of mistake and motive, and probative to rebut Mr. Becker's description of his relationship with Ms. Walsh.

The Pennsylvania Superior Court went further and found even if this evidence is prejudicial, it is not unfairly prejudicial because it did not "tend to show that [Mr. Becker] would have harbored a specific intent to kill on the night of the shooting"; the testimony of Danielle Detwiler "only showed that [Mr. Becker] had once brandished an actual firearm and that he shot her with plastic pellets from an 'airsoft' gun"; and, although Mr. Miller's testimony "established possible ill-will in the relationship between [Mr. Becker] and [Ms.] Walsh, and that [Mr. Becker] would threaten the use of firearms, there was no indication [Mr. Becker] would have employed a firearm with the specific intent to kill."[262]   Distinguishing the evidence here from the evidence in *Billa*, the court reasoned: "unlike *Billa*, the prior bad acts evidenced in the present case, while prejudicial, cannot be said to have impacted the jury's fair consideration of [Mr. Becker's] innocence or guilt of first degree murder as opposed to third-degree or manslaughter."[263]

Comparing this case to *Hutchinson*, the court found "overwhelming evidence" of Mr. Becker's malice and specific intent including: Mr. Becker "had a nearly fully loaded pistol pointed at [Ms.] Walsh"; Ms. Walsh sustained a gunshot "in a vital part of the body – *i.e.*, the head"; Mr. Becker gave inconsistent statements to investigators after the shooting; Mr. Becker's statements and behavior suggested consciousness of guilty; the jury listened to Mr. Becker' statement in full including his assertion he walked over to Ms. Walsh before the shooting to "devil" her; and evidence Mr. Becker did not try to resuscitate Ms. Walsh or call 911. The court concluded "it was in the province of the jury to weigh that evidence and accept the Commonwealth's argument that [Mr. Becker's] conduct following the shooting was consistent with a person who had intentionally killed another."[264]

Viewing Mr. Becker's ineffective assistance claim "through the lens" of section 2254, we do not find the Pennsylvania Superior Court's decision is contrary to, or is an unreasonable application of, *Strickland* or based on an unreasonable determination of the facts.  Mr. Becker only reiterates his argument as to prejudice, not how or why the Superior Court's decision runs afoul of section 2254(d).  We deny Mr. Becker's ineffective assistance claim on this ground.

**D.      There is no need for an evidentiary hearing.**

Mr. Becker asks us to vacate his conviction and sentence and grant him a new trial.  He also contends we should conduct an evidentiary hearing.  Although he asserts "habeas relief is appropriate on the current record," he argues "should the Court believe that factual development of the record is required in order to rule on any disputed material facts, it should conduct an evidentiary hearing."[265]

Our Court of Appeals recently discussed the standard for holding an evidentiary hearing in the context of a section 2255 habeas petition.  In *United States v. Scripps*, our Court of Appeals remanded to the district court for an evidentiary hearing defendant's section 2255 petition asserting ineffective assistance of counsel.[266] At trial, the district court offered trial counsel the opportunity for Mr. Scripps to speak during sentencing under Federal Rule of Criminal Procedure 32(i)(4)(A)(ii).[267]  Trial counsel told the district court he discussed the issue with his client, and Mr. Scripps did not wish to exercise his right to allocution.[268] At sentencing, the district court, concluding "[t]here's nothing in this record from which I could fairly conclude there's any remorse whatsoever," sentenced Mr. Scripps to the maximum period of incarceration with the Guidelines range for his offense.[269]

After an unsuccessful appeal, Mr. Scripps filed a habeas petition under 28 U.S.C. § 2255 arguing the district court erred in denying his request for an evidentiary hearing on his

ineffectiveness of appellate counsel claim for failing to raise the trial court's Rule 32 error on direct appeal.   Reviewing the district court on an abuse of discretion standard, our Court of Appeals first recognized the standard a "district court must hold an evidentiary hearing '[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief.'"[270]   Reviewing the record, the court of appeals found it did "not conclusively show that Scripps is not entitled to habeas relief for his ineffective assistance of appellate counsel claim. We cannot determine whether counsel's conduct fell below an objective standard of reasonableness for, while it would be highly unusual for counsel to omit such a clearly meritorious argument, nonetheless counsel may have had reasons for doing so."[271]   Without an evidentiary hearing, the court "[did] not know whether counsel had strategic reasons for failing to raise this error on appeal, and therefore, we cannot conclude as a matter of law that counsel was ineffective" under *Strickland*.[272]

Mr. Becker's record is entirely different than in *Scripps*. First, the post-conviction court held an evidentiary hearing on September 14, 2015 where Mr. Becker's trial counsel testified to the trial strategy.[273]   We relied on part of the testimony from the evidentiary hearing in assessing Mr. Becker's ineffective assistance claims here.   Second, Mr. Becker himself argues "habeas relief is appropriate on the current record" and if we "should … believe that factual development of the record is required in order to rule on any disputed material facts, [we] should conduct an evidentiary hearing."

Like Mr. Becker initially argues, we do not believe further factual development is required. Applying the standard, we find the parties' briefing and over 2,000 page record in this case "conclusively show[s] [Mr. Becker] is entitled to no relief."   Under *Scripps*, we need not hold an evidentiary hearing.

### E.       We deny a certificate of appealability.

"[A] state prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition."[274] Section 2253 provides the standard for a certificate of appealability required for appellate review of a district court's judgment denying habeas relief:

(a) In a habeas corpus proceeding or a proceeding under section 2255 before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held.

(b) There shall be no right of appeal from a final order in a proceeding to test the validity of a warrant to remove to another district or place for commitment or trial a person charged with a criminal offense against the United States, or to test the validity of such person's detention pending removal proceedings.

(c)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from—

(A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or

(B) the final order in a proceeding under section 2255.

(2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

(3) The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).[275]

A certificate of appealability "will issue only if the requirements of § 2253 have been satisfied."[276]   A habeas petitioner seeking a certificate of appealability "need only demonstrate 'a substantial showing of the denial of a constitutional right.'"[277]   A petitioner "satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."[278]

Federal Rule of Appellate Procedure 22 contemplates a district court issuing a certificate of appealability in the first instance: "(b) Certificate of Appealability. (1) In a habeas corpus

proceeding in which the detention complained of arises from process issued by a state court, or in a 28 U.S.C. § 2255 proceeding, the applicant cannot take an appeal unless a circuit justice or a circuit or district judge issues a certificate of appealability under 28 U.S.C. § 2253(c). If an applicant files a notice of appeal, the district clerk must send to the court of appeals the certificate (if any) and the statement described in Rule 11(a) of the Rules Governing Proceedings Under 28 U.S.C. § 2254 or § 2255 (if any), along with the notice of appeal and the file of the district-court proceedings. If the district judge has denied the certificate, the applicant may request a circuit judge to issue it."[279]

Given the standard we apply today to habeas challenges to state trial court evidentiary rulings and ineffectiveness of counsel, we cannot find jurists of reason could disagree with our reasoning in denying the petition. The closest question would arise on whether our Court of Appeals would find the Commonwealth waived a harmless error analysis and we should not find harmless error.  But we need not reach this question.  Mr. Becker has not met his burden in showing a reasonable jurist would disagree with the denial of the petition based on the objections.

## III.    Conclusion

Mr. Becker does not meet the burden set by Congress and the Supreme Court for a writ of habeas corpus on his evidentiary and ineffective assistance grounds.  We deny his petition and find no basis for a certificate of appealability.

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966). In *Miranda*, the Supreme Court held to protect the Fifth Amendment's privilege against self-incrimination, a person in custody and subjected to interrogation must (1) "first be informed in clear and unequivocal terms that he has the right to remain silent" and "that anything said can and will be used against the individual in court"; and (2) be informed of his "right to consult with counsel prior to questioning," the right "to have counsel present during any questioning if the defendant so desires," and "if he is indigent a lawyer will be appointed to represent him." *Id.* at 467-70, 473.

[2] The Commonwealth introduced the audio recording of the August 13, 2011 interview into evidence at trial and played it for the jury.

[3] Audio Aug. 13, 2011 interview at 20:39.

[4] *Id.* at 13:25-13:58.

[5] *Id.*

[6] *Id.* at 14:28-18:40; 31:29-39:20.

[7] *Id.* at 25:40, 27:22-28:00.

[8] *Id.* at 29:37-39:20.

[9] *Id.* at 8:13, 43:11-44:53.

[10] ECF Doc. No. 12-14 at 40 (N.T. March 4, 2013 at 1621). All references to page numbers, unless otherwise noted, are to the pagination assigned by the CM/ECF docketing system.

[11] Audio Aug. 13, 2011 interview at 39:20-40:38.

[12] ECF Doc. No. 12-14 at 39 (N.T. March 4, 2013 at 1618).

[13] ECF Doc. No. 12 at 13-15.

[14] *Id.* at 13.

[15] *Id.* at 13-14.

[16] *Id.* at 14.

[17] *Id.*

[18] *Id.*

[19] ECF Doc. No. 12 at 14-15.

[20] 50 P.S. §7302. Under section 7302 (commonly referred to as "302"), a person "shall be discharged whenever it is determined that he no longer is in need of treatment and in any event within 120 hours, unless within such period: (1) he is admitted to voluntary treatment pursuant to section 202 of this act; or (2) a certification for extended involuntary emergency treatment is filed pursuant to section 303 of this act." *Id.*

[21] ECF Doc. No. 12-16 at 26 (N.T. March 5, 2011 at 1829-30).

---

[22] ECF Doc. No. 12-14 at 75 (N.T. March 4, 2011 at 1760).

[23] ECF Doc. No. 12-14 at 73 (N.T. March 4, 2013 at 1751-52); ECF Doc. No. 12-16 at 62-65; ECF Doc. No. 12-18 at 70 (N.T. March 5, 2013 at 1976-1985; N.T. March 6, 2013 at 2226-2227).

[24] Sometime after Trooper Roberts left the scene on the morning of August 13, 2011, he interviewed the emergency personnel, James, Jodi, and Haley Becker (Mr. Becker's father, mother, and sister, respectively), and Megan Walsh.  ECF Doc. No. 12-16 at 65 (N.T. March 5, 2011 at 1986-87).

[25] ECF Doc. No. 12-16 at 65 (N.T. March 5, 2011 at 1987-88).

[26] *Id*. at 26 (N.T. March 5, 2011 at 1830-32).

[27] ECF Doc. No. 12-1 at 76, 78-79 (N.T. Aug. 15, 2012 suppression hearing at 38, 47-48). Under 50 P.S. § 7201, "[a]ny person 14 years of age or over who believes that he is in need of treatment and substantially understands the nature of voluntary treatment may submit himself to examination and treatment under this act, provided that the decision to do so is made voluntarily."  A person who voluntarily enters treatment must sign a consent form which must include representations: "[t]hat the person understands his treatment will involve inpatient status; that he is willing to be admitted to a designated facility for the purpose of such examination and treatment; and that he consents to such admission voluntarily, without coercion or duress; and, if applicable, that he has voluntarily agreed to remain in treatment for a specified period of no longer than 72 hours after having given written notice of his intent to withdraw from treatment." *Id.* at § 7203. "A person in voluntary inpatient treatment may withdraw at any time by giving written notice unless, as stated in section 203, he has agreed in writing at the time of his admission that his release can be delayed following such notice for a period to be specified in the agreement, provided that such period shall not exceed 72 hours. Any patient converted from involuntary treatment ordered pursuant to either section 304 or 305 to voluntary treatment status shall agree to remain in treatment for 72 hours after having given written notice of his intent to withdraw from treatment." *Id.* at § 7206 (footnotes omitted).

[28] ECF Doc. No. 12-1 at 79 (N.T. Aug. 15, 2012 suppression hearing at 50-51).

[29] *Id.*

[30] ECF Doc. No. 12-16 at 67 (N.T. March 5, 2011 at 1994-95).

[31] ECF Doc. No. 12-1 at 79 (N.T. Aug. 15, 2012 suppression hearing at 50-51).

[32] On August 15, 2012, the trial court held a pre-trial suppression hearing on Mr. Becker's omnibus pre-trial motion to suppress, *inter alia*, statements made at the August 18, 2011 interview.

[33] ECF Doc. No. 12-20 at 43-44 (N.T. March 7, 2013 at 2412-19).

[34] ECF Doc. No. 12-1 at 80-83 (N.T. Aug. 15, 2012 suppression hearing at 53-64).

[35] *Id.* at 82 (N.T. Aug. 15, 2012 suppression hearing at 63).

[36] ECF Doc. No. 17 at 20.

[37] *Id.*

[38] DVD of Aug. 18, 2011 interview at 10:20–10:33.

[39] *Id.*

[40] *Id.*

[41] ECF Doc. No. 12-20 at 49-50 (N.T. March 7, 2013 at 2437-40).

[42] *Id*. at 59 (N.T. March 7, 2013 at 2476-79).

[43] *Id*. at 60 (N.T. March 7, 2013 at 2480).

[44] DVD of Aug. 18, 2011 interview at 11:28:40; ECF Doc. No. 12-20 at 60 (N.T. March 7, 2013 at 2482).

[45] DVD of Aug. 18, 2011 at 11:37:28 to 11:50:30.

[46] *Id.* at 12:05-12:30.

[47] *Id*. at 12:55-12:56.

[48] *Id*. at 12:54-12:58.

[49] *Id*. at 13:14-13:55.

[50] *Id*.

[51] ECF Doc. No. 12-20 at 74 (N.T. March 7, 2013 at 2537-38); DVD of Aug. 18, 2011 interview at 14:14-14:22.

[52] ECF Doc. No. 12-1 at 33.

[53] ECF Doc. No. 12-2 at 75.

[54] *Id.*

[55] *Id.*

[56] *Id.* at 73-78.

[57] ECF Doc. No. 12-20 at 26 (N.T. March 7, 2013 at 2344-48).

[58] *Id.* at 30 (N.T. March 7, 2013 at 2362-64).

[59] ECF Doc. No. 12-1 at ¶ 37; ECF Doc. No. 12-1 at 49-50.

[60] ECF Doc. No. 12 at 7, n.1.

[61] ECF Doc. No. 12-20 at 36 (N.T. March 7, 2013 at 2385-87).

[62] ECF Doc. No. 12-24 at 74.

[63] ECF Doc. No. 12-25 at 37.

[64] *Id.* at 52.

[65] *Id.* at 56.

[66] *Id.*

[67] *Id.* at 56-57.

[68] *Id.* at 58-60.

[69] *Id.* at 63.

[70] *Id.* at 63-64.

[71] ECF Doc. No. 12-26 at 88.

[72] *Id.* at 98-102.

[73] *Id.* at 105.

[74] *Id.* at 168.

[75] ECF Doc. No. 12-27 at 107.

[76] *Id.* at 125.

[77] *Id.* (quoting *Commonwealth v. Page*, 985 A.2d 1212, 1221 (Pa. Super. Ct. 2009)).

---

[78] *Id.* Mr. Becker did not appeal the ineffective assistance claim based on a failure to object to and request a cautionary instruction to the Commonwealth's forensic pathologist expert's testimony "once a trigger is pulled, that's an intentional act."

[79] *Id.* at 134.

[80] ECF Doc. No. 12-28 at 8.

[81] ECF Doc. No. 12-29 at 28.

[82] *Id.* at 54-55.

[83] *Id.* at 65.

[84] *Id.* at 152.

[85] ECF Doc. No. 12.

[86] ECF Doc. No. 17.

[87] Our Court of Appeals recently discussed the standard for holding an evidentiary hearing in the context of a section 2255 habeas petition. *See United States v. Scripps*, 961 F.3d 626 (3d Cir. 2020). Under *Scripps*, we must hold an evidentiary hearing on a section 2255 habeas petition "'[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief.'" *Id.* at 631-32 (quoting *United States v. McCoy*, 410 F.3d 124, 131 (3d Cir. 2005)). As analyzed today, we need no evidentiary hearing because the motion and record in this case conclusively show Mr. Becker is not entitled to habeas relief.

[88] 28 U.S.C. § 2254(d).

[89] *Renico v. Lett*, 559 U.S. 766, 773 (2010) (quoting *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7 (1997) and *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002)) (footnote omitted).

[90] *Williams v. Taylor*, 529 U.S. 362, 410 (2000).

[91] *Id.* at 409.

[92] *Renico*, 559 U.S. at 773 (quoting *Williams*, 529 U.S. at 411).

[93] *Id.* (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)).

[94] *Woods v. Etherton*, — U.S. —, 136 S.Ct. 1149, 1151 (2016) (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011)); *Burt v. Titlow*, 571 U.S. 12, 19-20 (2013) (quoting *Harrington*, 562 U.S. at 102-103).

---

[95] *Rountree v. Balicki*, 640 F.3d 530, 537–38 (3d Cir. 2011); *Taylor v. Horn*, 504 F.3d 416, 433 (3d Cir. 2007).

[96] 28 U.S.C. § 2254(e)(1).

[97] *Woods*, 136 S.Ct. at 1151 (quoting *Burt,* 571 U.S. at 22) (internal citation omitted).

[98] *Id.* (quoting *Burt* at 15).

[99] *Gibbs v. Adm'r New Jersey State Prison*, No. 18-2691, 2020 WL 2537652, at *2 n. 6 (3d Cir. May 19, 2020) (citing *Wilson v. Sellers*, — U.S. ——, 138 S. Ct. 1188, 1192 (2018)).  We "look through" higher state courts' unexplained decisions to the last reasoned decision and make a rebuttable presumption that higher courts adopted this rationale. *Wilson*, 138 S.Ct. at 1193.

[100] *See Abdul-Shabazz v. Adm'r E. Jersey State Prison,* 799 F. App'x 167, 169 n. 2 (3d Cir. 2020) (citing *Bond v. Beard*, 539 F.3d 256, 289–90 (3d Cir. 2008)).

[101] ECF Doc. No. 12-26 at 88.

[102] ECF Doc. No. 12-29 at 28.

[103] DVD video at 11:28:40.

[104] *Id*. at 12:31:53.

[105] ECF Doc. No. 12-25 at 63.

[106] 560 U.S. 370 (2010).

[107] *Id.* at 381 (quoting *Davis v. United States*, 512 U.S. 452, 459, 461-62 (1994)).

[108] *Id.*

[109] *Davis*, 512 U.S. at 459.

[110] ECF Doc. No. 12-25 at 63-64.

[111] *Id.* (citing *Berghuis*, 560 U.S. at 387).

[112] *Id*. at 64.

[113] ECF Doc. No. 12-26 at 88. The trial court's Rule 1925(a) opinion is the last reasoned decision for review under section 2254(d).

[114] ECF Doc. No. 17 at 21.

[115] ECF Doc. No. 12 at 33-34. We understand this argument to encompass section 2254(d)(1) and (2)—the state court's decision on the merits is contrary to, or is an unreasonable application of, clearly established federal law by the Supreme Court and is based on an unreasonable determination of the facts in light of the evidence presented.

[116] *Miranda v. Arizona*, 384 U.S. 444 (1966).

[117] *United States v. Ludwikowski*, 944 F.3d 123, 131 (3d Cir. 2019) (quoting *Howes v. Fields*, 565 U.S. 499, 508-09 (2012)).

[118] *Howes*, 565 U.S. at 509 (internal citations omitted); *Yarborough v. Alvarado*, 541 U.S. 652, 663 (2004).

[119] *Id.* (quoting *Stansbury v. California*, 511 U.S. 318, 322, 325 (1994)).

[120] *Id.* (internal citations omitted).  *See also*, *United States v. Willaman*, 437 F.3d 354, 359–60 (3d Cir. 2006) (describing the "variety of factors" to determine custodial status: "(1) whether the officers told the suspect he was under arrest or free to leave; (2) the location or physical surroundings of the interrogation; (3) the length of the interrogation; (4) whether the officers used coercive tactics such as hostile tones of voice, the display of weapons, or physical restraint of the suspect's movement; and (5) whether the suspect voluntarily submitted to questioning") and *Ludwikowski*, 944 F.3d at 132 ("Numerous factors help answer" the question of whether a reasonable person would feel free to leave an interview: "the interview's location, physical surroundings, and duration; whether he voluntarily participated; whether he was physically restrained; whether other coercive tactics were used, such as hostile tones of voice or the display of weapons; and whether the interviewee was released when the questioning was over. We also consider whether the questioner believed the interviewee was guilty; whether the interviewee was specifically told he was not under arrest; and whether he agreed to meet knowing that he would be questioned about a criminal offense. However, the 'freedom-of-movement test' delineated by these factors 'identifies only a necessary and not a sufficient condition for *Miranda* custody.'" We must "ask[ ] the additional question whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*.") (citations omitted).

[121] *Stansbury*, 511 U.S. at 323.

[122] *Yarborough*, 541 U.S. at 663 (quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)).

[123] ECF Doc. No. 12-15 at 63.

[124] *Thompson*, 516 U.S. at 112; *Yarborough*, 541 U.S. at 663.

[125] *Thompson*, 516 U.S. at 112.

[126] *Id.* at 112-13.

[127] 28 U.S.C. § 2254(d)(1).

[128] ECF Doc. No. 12-1 at 79 (N.T. Aug. 15, 2012 suppression hearing at 50-51).

[129] ECF Doc. No. 12-16 at 67 (N.T. March 5, 2011 at 1994-95).

[130] ECF Doc. No. 12-1 at 79 (N.T. Aug. 15, 2012 suppression hearing at 51).

[131] *Id.* at 80 (N.T. Aug. 15, 2012 suppression hearing at 52-53).

[132] *Id.*

[133] *Id.*

[134] *Id.*

[135] ECF Doc. No. 17 at 18.

[136] ECF Doc. No. 12-1 at 88 (N.T. Aug. 15, 2012 suppression hearing at 84-85).

[137] *Thompson*, 516 U.S. at 112; *Yarborough*, 541 U.S. at 663.

[138] After an August 15, 2012 suppression hearing, Mr. Becker briefed his omnibus pre-trial motion arguing the trial court should exclude Rule 404(b) evidence and the August 18, 2011 interview with troopers because (a) he was in custody and (b) he unambiguously invoked his right to remain silent through the statements "I don't know. I have nothing more to say 'cause no matter what I say, youse trying to make me something I'm not" and "O.K. I'm done now." ECF Doc. No. 12-2 at 52-70. The Commonwealth responded arguing troopers did not hold Mr. Becker in custody during the August 18, 2011 interview and he did not unambiguously invoke his right to remain silent. ECF Doc. No. 12-2 at 46-51.

[139] *Yarborough*, 541 U.S. at 664-65.

[140] ECF Doc. No. 17 at 11.

[141] *Yarborough*, 541 U.S. at 665.

[142] 560 U.S. 370 (2010).

[143] *Id.* at 379.

[144] *Id.* at 381 (quoting *Davis v. United States*, 512 U.S. 452, 459, 461-62 (1994)).

[145] *Id.*

[146] *Id.* at 382 (quoting *Michigan v. Mosely*, 423 U.S. 96, 103 (1975)).

[147] *Davis*, 512 U.S. at 459.

[148] ECF Doc. No. 12-25 at 64.

[149] *Berghuis*, 560 U.S. at 387.

[150] ECF Doc. No. 12-25 at 64.

[151] ECF Doc. No. 17 at 21.

[152] *United States v. Tian Xue*, No. 16-22-4, 2018 WL 3328165, at *7 (E.D. Pa. July 6, 2018) (citing *Davis*, 512 U.S. at 459) ("Maybe I should talk to a lawyer" is not a request for counsel).

[153] *Evans v. Phelps*, No. 10–92, 2012 WL 1134482, at *9 (D. Del. Apr. 2, 2012).

[154] *United States v. Ward*, No. 15–36, 2015 WL 5474232, at *5 (E.D. Ky. Sept. 17, 2015). *See also*, *United States v. Johnson*, No. 11-49, 2011 WL 2604774, at *3  (W.D. Mich. June 30, 2011) (defendant's statement "I don't really even want to get into it" in context "sounds more like a loss for words than the invocation of a constitutional right, especially given that he immediately proceeds to 'get into it'"); *United States v. Newland*, No. 09-71, 2010 WL 2629504 (N.D. Ind. June 25, 2010) (statement "I wanna go back upstairs ... So you came out here for no reason. I'd like to go back upstairs" and "Alright, like I said, ... I'll go back upstairs ... I'm done ...You made a worthless trip. Sorry" given the context including defendant's intent to continue the interview and continued talking, is not an unambiguous invocation of the right to remain silent).

[155]  *Smith v. Boughton*, No. 15-1235, 2017 WL 1743703 (E.D. Wis. May 4, 2017) (defendant's statement "I don't want to talk ... I don't know nothing about this, see. That's—I'm talking about this, uh, van. This stolen van. I don't know nothing about this stuff. So, I don't even want to talk about this" is not an unambiguous invocation to cut off further questioning).

[156] *United States v. Yodprasit*, No. 15-4085, 2016 WL 1069671 (N.D. Iowa, Mar. 17, 2016) (defendant's statement "I've got noth'n else to say—what I've already told you guys is what I wanna say" is not a clear, consistent expression of a desire to remain silent and is, instead, an equivocal statement under the circumstances insufficient to invoke the right to remain silent).

[157] *Flores v. Muniz*, No. 16–1475, 2018 WL 1806184 (E.D. Cal. Apr. 17, 2018) ("I'm done talking" is an unambiguous invocation).

[158] *United States v. Coriz*, No. 17-1105, 2018 WL 4222383 (D.N.M. Sept. 5, 2018) (statements defendant does not want to talk anymore, "I have nothing more to say." and "I don't need to say anymore." are clear and unequivocal).

---

[159] *Saeger v. Avila*, 930 F.Supp.2d 1009 (E.D. Wis. 2013) (statement "I got nothin[g] more to say to you. I'm done. This is over" is an unambiguous invocation of the right to remain silent). *See also United States v. Samuel*, No. 09-128, 2010 WL 3091934 (W.D.N.Y. July 14, 2010) (statements "I'm not trying to be disrespectful, but I'm done talking. I'll just take my time and roll. I'm not a snitch or giving any statements" are unambiguous and unequivocal invocations of the right to remain silent), *report and recommendation adopted* 2010 WL 3091704 (W.D.N.Y. Aug. 5, 2010).

[160] DVD of Aug. 18, 2011 interview at 12:31:51.

[161] *Id.* at 12:29:44.

[162] *Id.* at 12:30-12:31:14.

[163] *Id.* at 12:31.

[164] *Id.* at 12:31:51.

[165] *Renico*, 599 U.S. at 773 (quoting *Williams*, 529 U.S. at 411).

[166] Because the trial court found the August 18 interview non-custodial and, even if it was custodial, Mr. Becker failed to unambiguously invoke his right to remain silent, so neither the state trial court nor the Pennsylvania Superior Court reached the question of whether admission of the alleged post-invocation statements from the August 18 interview amounts to harmless error.   In its briefing here, the Commonwealth does not raise harmless error. Under the law of this Circuit, the Commonwealth waived the harmless error argument by failing to raise it in its habeas briefing. *Lam v. Kelchner*, 304 F.3d 256, 269-70 (3d Cir. 2002). We have discretion, however, to review a habeas petition for harmless error. *United States v. Davis*, 726 F.3d 434, 445 n. 8 (3d Cir. 2013); *Rhodes v. Dittman*, 903 F.3d 646, 664-65 (7th Cir. 2018); *Gover v. Perry*, 698 F.3d 295, 301 (6th Cir. 2012).

We do not need to address harmless error given our Congressionally mandated deference to the soundness of the trial court's evidentiary and trial rulings.

Even if we did so, we would find harmless error. We are instructed to consider a "host of factors" in determining harmlessness: "the importance of the witness'[s] testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Johnson v. Superintendent Fayette SCI*, 949 F.3d 791, 799 (3d Cir. 2020) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986). "In framing our analysis, our role is not to question whether the evidence could support a guilty verdict, but 'rather, even so, whether the error itself had substantial influence.'" *Id.* (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)).

We would find the trial court's admission of evidence to be harmless. The Commonwealth presented statements made **before** the alleged *Miranda* invocations concerning Mr. Becker's accidental shooting theory and evidence demonstrating his "accident" explanation is simply not possible. Mr. Becker never denied shooting Ms. Walsh; indeed, he admitted he shot her, but accidentally. His explanation for an accidental shooting is he cleaned his gun and did not point the gun at her, he began to cycle rounds out of the gun, and it suddenly fired, hitting Ms. Walsh in the left temple. At the August 13, 2011 interview, Mr. Becker insisted he did not have the magazine in the gun. But when the Fire Chief cleared the gun the night of the shooting, he found a round in the gun, meaning the magazine must have been in the gun. Mr. Becker insisted he cycled rounds out of the gun which would be lying on the floor of the bedroom, but troopers recovered the magazine loaded with eight rounds. Mr. Becker initially explained he had his thumb on the hammer of the gun, but when pressed by Corporal Courtright this could not be true because of the gun's grip safety feature, Mr. Becker then denied saying his thumb had been on the hammer. Despite telling troopers he knew how to handle a gun, he does not "play around" with guns, he "know[s] his firearms," and "know[s] what [he's] doing" with guns, Mr. Becker insisted he did not know the gun was loaded. Mr. Becker insisted he performed CPR, but a first responder testified he saw no signs of CPR being administered and, despite an instantly fatal head wound, Mr. Becker did not have blood on his torso. The coroner testified the bullet hit Ms. Walsh in the left temple killing her instantly. All this evidence came out before the alleged *Miranda* invocation.

The evidence showed the gun was loaded at the time of the shooting, notwithstanding Mr. Becker's claim it was not loaded because he wanted to clean it. The jury considered, among other issues, why Mr. Becker loaded a gun to clean it. The jury, having been properly instructed, found Mr. Becker guilty of first-degree murder. Considering the overwhelming evidence against Mr. Becker's accidental shooting defense, any post-invocation evidence from the August 18 interview did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (quoting *Kotteakos*, 328 U.S. at 776).

[167] 28 U.S.C. § 2254(b)(1).

[168] *Nara v. Frank*, 488 F.3d 187, 197 (3d Cir. 2007) (quoting *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999)).

[169] *Id.* (citing *Baldwin v. Reese*, 541 U.S. 27, 29 (2004); *O'Sullivan*, 526 U.S. at 848; *Cristin v. Brennan*, 281 F.3d 404, 410 (3d Cir. 2002); *Doctor v. Walters*, 96 F.3d 675, 678 (3d Cir. 1996)).

[170] *Id.*

[171] *Bennett v. Superintendent Graterford SCI*, 886 F.3d 268, 280 (3d Cir. 2018) (quoting *Wilkerson v. Superintendent*, 871 F.3d 221, 228–29 (3d Cir. 2017)).

[172] *Coker v. DelBaso*, No. 18-3385, 2020 WL 1816084, at *10 (E.D. Pa. Apr. 10, 2020) (citing *Lines v. Larkins*, 208 F.3d 153, 160 (3d Cir. 2000)).

[173] ECF Doc. No. 12-25 at 77-135.

[174] *Id.* at 60, 109.

[175] *See* ECF Doc. No 17 at 26 n. 2; ECF Doc. No. 12-25 at 109.

[176] ECF Doc. No. 12-25 at 91, 109.

[177] *Id.* at 109.

[178] *Id.* at 60.

[179] ECF Doc. No. 12-15 at 60.

[180] In reviewing the record, we found one line in Mr. Becker's Superior Court brief regarding the Detwilers' testimony: "The effect of this testimony was to strip the Defendant of his presumption of innocence and deny him due process of law."  *Id*. at 106.  Mr. Becker failed to develop the argument or cite authority in his habeas petition.

[181] Pa. Rule of Evid. 404(b)(1).  Pennsylvania amended Rule 404 in March 2013.

[182] *Id.* at 404(b)(2).

[183] *Id.* at 404(b)(3).

[184] ECF Doc. No. 12-26 at 94.

[185] *Id.* at 93.

[186] *Id.* at 94-95.

[187] *Id.* at 95.

[188] *Id.* at 96-97.

[189] *Id.* at 97-100.

[190] *Delvalle v. Superintendent Frackville SCI*, 803 F. App'x 635, 638 (3d Cir. 2020).

[191] *Id.* (quoting *Brecht*, 507 U.S. at 637).

[192] *Id.* (citing *Davis v. Ayala*, 576 U.S. 257, 268 (2015)).

[193] ECF Doc. No. 12-26 at 101-102 (internal citations to the record omitted).

[194] *Estelle v. McGuire*, 502 U.S. 62, 67 (1991).

[195] *Id.* at 68.

[196] *Bronshtein v. Horn*, 404 F.3d 700, 730 (3d Cir. 2005) (quoting *Lesko v. Owens*, 881 F.2d 44, 52 (3d Cir. 1989)).

[197] 410 U.S. 284 (1973).

[198] 493 U.S. 342 (1990).

[199] *Bronshtein*, 404 F.3d at 730 (quoting *Lesko v. Owens*, 881 F.2d 44, 52 (3d Cir.1989)).

[200] *Allison v. Superintendent Waymart SCI*, 703 F. App'x 91, 97 (3d Cir. 2017) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 639 (1974)).

[201] ECF Doc. No. 12-20 at 26 (N.T. March 7, 2013 at 2344-48).

[202] *Id.* at 30 ([N.T. March 7, 2013 at 2362-64).

[203] ECF Doc. No. 12 at 36.

[204] ECF Doc. No. 12-26 at 93.

[205] *Id.* at 94.

[206] *Id.* at 95.

[207] *Id.* at 96.

[208] *Id.* at 96-97.

[209] *Id.* at 88.

[210] *Gibbs*, 2020 WL 2537652, at *2 (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)).

[211] *Scripps*, 961 F.3d at 632 (quoting *Strickland*, 466 U.S. at 688, 689, 694).

[212] *Commonwealth v. Colavita*, 993 A.2d 874, 886–87 (Pa. 2010) (quoting *Commonwealth v. Carson*, 913 A.2d 220, 233 (Pa. 2006)).

[213] *Werts v. Vaughn*, 228 F.3d 178, 204 (3d Cir. 2000).

[214] *Elias*, 774 F. App'x at 750 (quoting 28 U.S.C. § 2254(d)).

[215] *Id.* (quoting *Collins v. Sec'y of Pa. Dep't of Corr.*, 742 F.3d 528, 546-47 (3d Cir. 2014)).

[216] *Gibbs*, 2020 WL 2537652, at *2 (quoting *Strickland* at 687–88; *Harrington*, 562 U.S. at 105).

[217] ECF Doc. No. 12-28 at 83, 88-91.

[218] 475 U.S. 412 (1986).

[219] *Id.* at 415-16.

[220] *Id.* at 420.

[221] *Id.* at 422-23 (internal citations omitted) (footnote omitted).

[222] *Id.* at 423-24 (internal citations omitted).

[223] *Commonwealth v. Arroyo*, 723 A.2d 162 (Pa. 1999); *Commonwealth v. Rushing*, 71 A.3d 939 (Pa. Super. Ct. 2013), *rev'd on other grounds*, 99 A.3d 416 (Pa. 2014).

[224] ECF Doc. No. 17 at 31 (emphasis added).

[225] ECF Doc. No. 12-16 at 19 (N.T. March 5, 2013 at 1804). Immediately preceding these questions, Corporal Courtright's testified regarding Mr. Becker's waiver of *Miranda* rights as follows:

> Q.  When these rights were being reviewed with Matthew Becker, did he indicate his understanding of these rights?
>
> A.  Yes.
>
> Q.  While these rights were being reviewed with Matthew Becker, did he ask you or Trooper Roberts any questions?
>
> A.  No.
>
> Q.  While these rights were being reviewed with Matthew Becker, did he request either clarification or explanation of these rights?
>
> A.  No.
>
> Q.  While these rights were being reviewed with Matthew Becker, were you able to understand him if he said anything while these rights were being reviewed?
>
> A.  Yes.

Q.  Was Matthew Becker under any apparent influence of alcohol?

A.  No.

Q.  Was Matthew Becker under any apparent influence of any controlled substance?

A.  No.

Q.  If Matthew Becker had exhibited any difficulty conversing with or understanding you, would you have proceeded with the interview?

A.  No.

Q.  Did you or Trooper Roberts make any express or implied promises or consideration in exchange for Matthew Becker providing you with a statement?

A.  No.

Q.  Did you or Trooper Roberts force, coerce or threaten Matthew Becker to provide a statement?

A.  No.

*Id*. at 1802-03.

[226] ECF Doc. No. 12-27 at 17-18 (N.T. Sept. 14, 2015 PCRA hearing at 34-35).

[227] *Id.* at 115-117.

[228] *Colavita*, 993 A.2d at 887 (quoting *Commonwealth v. Howard*, 719 A.2d 233, 237 (Pa. 1998)).

[229] ECF Doc. No. 12-29 at 44.

[230] *Werts*, 228 F.3d at 204.

[231] Pennsylvania Suggested Standard Jury Instruction (Criminal) 3.02B provides the *corpus delicti* instruction in homicide cases:

> 1. As I told you, you may not consider the statement as evidence against the defendant unless you find beyond a reasonable doubt that a crime was committed. To consider the statement as evidence, you must be satisfied beyond a reasonable doubt by all of the evidence, excluding the statement, that [name of victim] is dead and that [his] [her] death was probably caused by someone feloniously killing [him] [her].

2. The other evidence need not tend to show that the crime was committed by the defendant, only that the crime was committed by someone. Furthermore, the other evidence need not rule out all possibility of accident or suicide. It is enough if you are satisfied beyond a reasonable doubt that the circumstances are more consistent with death having been caused by a felonious killing than in some other way.

3. The object of these rules is to guard against convicting a person of a crime that never really happened even though the defendant stated that it did occur.

Pa. SSJI (Crim) 3.02B.

[232] ECF Doc. No. 17 at 40.

[233] *Sawyer v. Superintendent Muncy SCI,* 619 F. App'x 163, 166 (3d. Cir. 2015). "*Corpus delicti*" means "body of the crime." *Id.* at n.2.

[234] *Interest of G.E.W.*, No. 1873 MDA 2019, 2020 WL 3045682, at *4 (Pa. Super. Ct. June 8, 2020).

[235] *Commonwealth v. Dupre*, 866 A.2d 1089, 1097–98 (Pa. Super. Ct. 2005) (quoting *Commonwealth v. Meder*, 611 A.2d 213, 217 (Pa. Super. Ct. 1992), *appeal denied,* 622 A.2d 1375 (Pa. 1993)).

[236] *Interest of G.E.W.*, 2020 WL 3045682, at * 3 (quoting *Commonwealth v. Harper*, 711 WDA 2019, 2020 WL 1516934, at *7 (Pa. Super. Ct. Mar. 30, 2020)).

[237] *Id.*

[238] ECF Doc. No. 12-27 at 18 (N.T. Sept. 14, 2015 PCRA hearing at 37).

[239] ECF Doc. No. 12-19 at 45-51.

[240] *Id.*

[241] *Id.*

[242] *Id.*

[243] ECF Doc. No. 17 at 39-40.

[244] ECF Doc. No. 12-27 at 50.

[245] *Id.*

[246] *Id.*

[247] ECF Doc. No. 17 at 40.

[248] 28 U.S.C. § 2254(d).

[249] ECF Doc. No. 12-27 at 24-25 (N.T. Sept. 14, 2015 PCRA hearing at 66-67).

[250] ECF Doc. No. 12-28 at 28, 54-55.

[251] *Commonwealth v. Spotz*, 84 A.3d 294, 315 (Pa. 2014) (quoting *Commonwealth v. Pierce*, 527 A.2d 973, 977 (Pa. 1987)).

[252] *Commonwealth v. Ali*, 10 A.3d 282, 291 (Pa. 2010) (quoting *Commonwealth v. Gribble*, 863 A.2d 455, 460 (Pa. 2004) (collecting cases)).

[253] 555 A.2d 835 (Pa. 1989).

[254] 25 A.3d 277 (Pa. 2011).

[255] *Billa*, 555 A.3d at 181.

[256] *Id.* at 183.

[257] *Id.* at 182-83.

[258] *Hutchinson*, 25 A.3d at 299.

[259] *Id.* at 306.

[260] *Id.*

[261] ECF Doc. No. 12-29 at 28, 61.

[262] *Id.* at 28, 61-62.

[263] *Id.*

[264] *Id.*

[265] ECF Doc. No. 17 at 45, n.3.

[266] 961 F.3d 626 (2020).

[267] Federal Rule of Criminal Procedure 32(i)(4)(A)(ii) requires, *inter alia*, "Before imposing sentence, the court must: … (ii) address the defendant personally in order to permit the defendant to speak or present any information to mitigate the sentence …."

[268] *Scripps*, 961 F.3d at 629.

[269] *Id.* at 630.

[270] *Id.* at 631-32 (quoting *United States v. McCoy*, 410 F.3d 124, 131 (3d Cir. 2005)).

[271] *Id.* at 634 (footnote omitted).

[272] *Id.* at 634-35.

[273] ECF Doc. No. 12-27 at 8-25.

[274] *Miller-El v. Cockrell*, 537 U.S. 322, 335–37 (2003) (citing 28 U.S.C. § 2253).

[275] 28 U.S.C. § 2253.

[276] *Miller-El*, 537 U.S. at 336.

[277] *Id.* at 327 (citing 28 U.S.C. § 2253(c)(2)).

[278] *Id.* at 323 (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

[279] Fed.R.App.P. 22(b)(1).